[No. S138104. July 30, 2007.]

ERNEST CASTANEDA, Plaintiff and Appellant, v.
GEORGE OLSHER et al., Defendants and Respondents.

## Counsel

Sutherland & Gerber and Lowell F. Sutherland for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad, Barry R. Levy, Kim L. Nguyen; Hollins • Schechter and Bruce Lee Schechter for Defendants and Respondents.

Heidi Palutke for California Apartment Association as Amicus Curiae on behalf of Defendants and Respondents.

Bien & Summers, Elliot L. Bien and E. Elizabeth Summers for Western Manufactured Housing Communities Association as Amicus Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

Deborah J. LaFetra for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

## Opinion

**WERDEGAR, J.**—Defendants George Olsher, Paule Olsher and P&G Enterprises (collectively Olsher) own a mobilehome park in which plaintiff Ernest Castaneda lived. Plaintiff was shot and injured while he was a bystander to a gang confrontation involving a resident of the mobilehome across the street from his. He sued Olsher contending Olsher had breached a duty not to rent to known gang members or to evict them when they harass other tenants. The superior court granted a defense motion for nonsuit after presentation of plaintiff's case, but the Court of Appeal reversed.

 We conclude the grant of nonsuit was proper. Landlords, including mobilehome park owners, ordinarily have no duty to reject prospective tenants they believe, or have reason to believe, are gang members. To recognize such a duty would tend to encourage arbitrary housing discrimination and would place landlords in the untenable situation of facing potential liability whichever choice they make about a prospective tenant. With regard to eviction, we agree that a residential tenant's behavior and known criminal associations may, in some circumstances, create such a high level of foreseeable danger to others that the landlord is obliged to take measures to remove the tenant from the premises or bear a portion of the legal responsibility for injuries the tenant subsequently causes. In the present case, however, the facts known to Olsher did not make a violent gang confrontation involving these tenants so highly foreseeable as to justify imposition of a duty to undertake eviction proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Olsher has owned the Winterland-Westways mobilehome park in El Centro since at least 1991. Beverly Rogers and her son, Rodney Hicks, lived at and managed the 60-space park. On the night he was shot, November 9, 1996, plaintiff (who was 17 years old) lived in a mobilehome on space 10 with his grandmother and older sister.

The mobilehome on space 23, across the street from plaintiff's, was occupied by Paul Levario. Beverly Rogers, the onsite property manager, testified that in the year prior to the shooting, space 23 was leased to Carmen Levario. According to Rogers, however, Carmen Levario did not live there. Rather, Rogers told another witness, the home was vacant, but "the son of the [mobilehome] owner" (a Mr. Levario) was "hanging out there."

A former El Centro police officer who had specialized in studying and controlling local criminal gangs identified Paul Levario as a member of the Northside El Centro gang. According to the police report and an eyewitness, a fellow Northsider who was visiting Levario, Manuel Viloria, fired the shot that injured plaintiff.

On the night of his injury, plaintiff attended a party outside the mobilehome park. Sometime after 1:00 or 2:00 a.m., he drove home with three friends. Plaintiff went inside his mobilehome briefly to let his sister know they were there, while his friends waited in the car. A few minutes later, another car, with four young men in it, pulled up behind plaintiff's car. Around the same time, two young men came out of the mobilehome across the street and, according to one of plaintiff's friends, Christina Sandoval, started "exchanging words and gang slurs" with the men in the second car.

Sandoval recognized one of the men from the mobilehome as Manuel Viloria and saw what she thought was a gun in his hand. One of the men in the second car yelled, "Westside Centro, Westside Centro," while the men from the mobilehome called out, "Northside Centro." After a few minutes, as Sandoval and another friend started toward plaintiff's home, "shots were fired." Plaintiff, who had reemerged from his home to his front porch area, was hit in the back.

Two or three months before the shooting, plaintiff's grandmother, Joyce Trow, complained to Rogers about people Trow thought looked like gang members hanging around the mobilehome park and breaking the bulbs in the outdoor lights. According to Trow, Rogers responded that there was "one more batch" moving in "right across from" Trow. When asked whether she could prevent this, Rogers said she could not; she had talked to George Olsher, but he had told her, "Go ahead and rent to them. Their money is as good as yours," or something to that effect.

Joyce Trow testified that for approximately two months before the shooting she saw people dressed like gang members congregating at the mobilehome across the street from hers. Her granddaughter (and plaintiff's sister), Diana Castaneda, encountered groups of four or five men, including the mobilehome owner's son, dressed in baggy pants and flannel shirts, drinking from 40-ounce bottles outside the mobilehome on space 23 over the month before plaintiff was shot. Because they whistled and hooted at her sometimes, she felt "a small amount of fear" and tried to avoid attracting their attention, covering herself up and walking quickly between her car and her home. Diana Castaneda told her grandmother about the incidents, and Trow testified she conveyed her granddaughter's complaint to Rogers, although Rogers testified she never received any complaints about the occupants of the mobilehome on space 23.

Another tenant, Monica Preciado-Langford, testified that when she walked with her small children past space 23, the "boys hanging out" there, who wore bandanas or Pendleton jackets, would sometimes kick their pit bull in the mouth to make it growl. Preciado-Langford asked the boys to stop, but they ignored her. She complained to Rogers about this group of boys, as well as about those at space 24, who were throwing rocks, and about lights that were broken at the park. On another occasion, someone broke windows on Preciado-Langford's car; another resident told her the perpetrators were from spaces 23 and 24. Preciado-Langford complained to Rogers about that incident as well. Rogers responded to these complaints by saying there was nothing she could do, the owner "didn't want to invest any more money and that the people in the park had no place else to go."

Evidence was presented of two prior gunshot incidents related to the mobilehome park. In August 1995, a bullet—fired by an unknown shooter from a location estimated to be outside the mobilehome park—went through an occupied mobilehome, but did not hit anyone. In early 1996, during what Rodney Hicks, Rogers's son and assistant, was told was a gang confrontation, shots were fired on a property contiguous to the mobilehome park. A boy who lived at the park, seen trying to hide a gun after the shooting, was arrested that evening and never returned to the park; the management undertook efforts to evict his family. Rogers knew or was informed of both incidents.

Prior to the shooting that injured plaintiff, there had also been drug sales and apparent gang members at the mobilehome park. Rogers identified residents of four mobilehomes, other than the occupants of the mobilehome on space 23, who she thought were members or aspiring members of gangs (including the boy arrested in the shooting incident on the property next to the park). Gang graffiti, including references to "Westside Centro," was seen regularly at the park. Rogers and Hicks painted it out "every day." Between 1993 and 1996, Hicks testified, he saw what he believed to be drug sales at the park "once or twice a week." Hicks and Rogers both told Olsher of these problems; Olsher told Rogers there was nothing they could do to evict the problem tenants and suggested Hicks call the police.[1]

At the close of plaintiff's case, defendants moved for nonsuit, contending no duty was established and causation was unproven. Plaintiff argued Olsher had a duty "not to rent to [the Levarios] in the first place," to "remove them once he began to get complaints from the tenants that they constituted an annoyance," or, failing that, to take additional security measures such as hiring guards. Causation was shown because had Olsher not breached his duty to "get . . . dangerous gang members out of the park," the gang member who shot plaintiff would not have been on the premises. The trial court concluded nonsuit was proper on the ground "plaintiff has failed to show prior similar incidents such that a shooting herein was highly foreseeable; therefore, under *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] the landlord owed no duty to plaintiff."

The Court of Appeal reversed and remanded for trial. In the appellate court's assessment, plaintiff "presented evidence that Olsher was aware that he was renting spaces in his mobilehome park to gang members and that there had been a variety of gang-related criminal activity and other similar crimes occurring on and near the premises. [¶] . . . Olsher [thus] had a duty to

---

[1] Seeking reconsideration after the trial court indicated it would grant the nonsuit, plaintiff asked to reopen his case and offered to prove that there had been a rape in the park laundry room and a variety of less serious crimes, mainly thefts, burglaries and vandalism, in the period 1991–1996. The court considered the offer of proof but denied reconsideration.

undertake additional security measures in the Park to protect residents from potential violence occurring on the property. Castaneda presented sufficient evidence that Olsher's breach of this duty was a substantial factor in bringing about his injuries for this case to be decided by the jury."

We granted Olsher's petition for review.

## DISCUSSION

■ A landlord generally owes a tenant the duty, arising out of their special relationship, to take reasonable measures to secure areas under the landlord's control against foreseeable criminal acts of third parties. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*); *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 674 (*Ann M.*); *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 279–280 [12 Cal.Rptr.3d 846].) In each case, however, the existence and scope of a property owner's duty to protect against third party crime is a question of law for the court to resolve. (*Delgado,* at pp. 237–238; *Ann M.,* at pp. 674, 678–679.)

■ In determining a duty's existence and scope, our precedents call for consideration of several factors: " '[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ann M., supra,* 6 Cal.4th at p. 675, fn. 5, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*).) Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis. (*Delgado, supra,* 36 Cal.4th at p. 237, fn. 15; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189–1190, fn. 2 [91 Cal.Rptr.2d 35, 989 P.2d 121].)

■ "Turning to the question of the scope of a landlord's duty to provide protection from foreseeable third party crime, . . . we have recognized that the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' " (*Ann M., supra,* 6 Cal.4th at pp. 678–679.) We recently

reaffirmed this analysis, which we described as a "sliding-scale balancing formula." (*Delgado, supra*, 36 Cal.4th at p. 243.)

■ The duty analysis we have developed requires the court in each case (whether trial or appellate) to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake. "Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed on the landlord." (*Vasquez v. Residential Investments, Inc., supra*, 118 Cal.App.4th at p. 280.) The Court of Appeal in *Vasquez* accurately described the full analytical process in this way: "First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord." (*Id.* at p. 285, fns. omitted.) Again, other *Rowland* factors may come into play in a given case, but the balance of burdens and foreseeability is generally primary to the analysis. (*Vasquez*, at p. 285, fn. 10.)

■ Although duty is a legal question, the factual background against which we decide it is a function of a particular case's procedural posture. On review of a judgment of nonsuit, as here, we must view the facts in the light most favorable to the plaintiff. "[C]ourts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper. The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . .' " (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d

112, 117–118 [184 Cal.Rptr. 891, 649 P.2d 224].) The same rule applies on appeal from the grant of a nonsuit. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

We begin by identifying the specific action or actions plaintiff claims defendants were obliged to take to protect him from being shot.

As he did in the lower courts, plaintiff contends Olsher owed him a duty not to rent space 23 to the Levarios and, once having rented it, to evict them for disturbing and harassing other park residents. Asking rhetorically what Olsher should have done to protect him, plaintiff answers: "When told by Mrs. Rogers that a new bunch of gangsters wanted to move in across from Mrs. Trow, a reasonable person seeking to provide for the safety of his tenants, would just say 'no.' " Plaintiff argues that in light of the danger of violence that accompanies the presence of street gangs and illicit drug dealing, the shooting that injured him was sufficiently foreseeable to justify imposition of a duty to decline to rent to, or to evict, known gang members, duties he characterizes as placing only a "slight" burden on the landlord. Secondarily, plaintiff also contends that having rented to gang members and failing to evict them, Olsher should have hired trained security guards to suppress gang activity at the mobilehome park and should have improved and maintained the park's lighting.

Defendants and amici curiae supporting their position contend, in response, that imposing a duty on residential landlords to exclude gang members by refusal to rent or eviction would place on landlords a heavy screening burden and force them to make rental decisions according to stereotypes about gang members' ethnicity and appearance. Imposition of such a burden and creation of such incentives for housing discrimination are not justified, they argue, by the known risk of violence posed by apparent gang members generally or by the risks foreseeable to Olsher in this case.

We examine, first, the asserted duty to refuse to rent housing to members of street gangs; second, the asserted duty to evict gang member tenants; and last, other security measures plaintiff asserts should have been taken. The first duty, we conclude, cannot be imposed except under circumstances where gang violence is extraordinarily foreseeable. The second, we conclude, exists where violence involving existing gang member tenants is highly foreseeable, but we also conclude the facts of this case do not create that level of foreseeability. With regard to other security measures, we conclude the evidence is legally insufficient to show their absence contributed causally to plaintiff's injury.

## I. *Duty Not to Rent to Gang Members*

■ Plaintiff emphasizes the threat violent street gangs and associated illicit drug dealing pose to the safety of peaceful Californians and argues the extent of this danger warrants imposing a duty on landlords not to rent to gang members. We agree the threat is of the most serious dimensions and state policy urgently seeks its alleviation. The Legislature has said as much, and the Official Reports are replete with examples of the problem. (Pen. Code, § 186.21; see, e.g., *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 770 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *People v. Gardeley* (1996) 14 Cal.4th 605, 610–613 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *Claxton v. Atlantic Richfield Co.* (2003) 108 Cal.App.4th 327, 330–333 [133 Cal.Rptr.2d 425]; *Zuniga v. Housing Authority* (1995) 41 Cal.App.4th 82, 90 [48 Cal.Rptr.2d 353]; *Medina v. Hillshore Partners* (1995) 40 Cal.App.4th 477, 480 [46 Cal.Rptr.2d 871]; *Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1268 [263 Cal.Rptr. 202].) Street gang activity can often subject residents of an apartment building or mobilehome park to unacceptable levels of fear and risk. But we are not persuaded that imposing a duty on landlords to withhold rental units from those they believe to be gang members is a fair or workable solution to this problem, or one consistent with our state's public policy as a whole. Absent circumstances showing extraordinary foreseeability, we decline to recognize such a duty.

As defendants note, "Gang members do not . . . announce their gang affiliations on housing applications." If landlords regularly face liability for injuries gang members cause on the premises, they will tend to deny rental to anyone who *might* be a gang member or, even more broadly, to any family one of whose members might be in a gang. The result in many cases would be arbitrary discrimination on the basis of race, ethnicity, family composition, dress and appearance, or reputation. All of these are, in at least some circumstances, illegal and against public policy and could themselves subject the landlord to liability. (See Gov. Code, §§ 12920, 12955 [California Fair Employment and Housing Act provisions stating policy against, and prohibiting, housing discrimination on the basis of race, ancestry or familial status, among other bases]; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 739 [180 Cal.Rptr. 496, 640 P.2d 115] [Unruh Civil Rights Act (Civ. Code, § 51) prohibits a landlord in a large housing complex from excluding families with children: the act "does not permit a business enterprise to exclude an *entire class* of individuals on the basis of a generalized prediction that the class 'as a whole' is more likely to commit misconduct than some other class of the public"]; *In re Cox* (1970) 3 Cal.3d 205, 217–218 [90 Cal.Rptr. 24, 474 P.2d 992] [Unruh Civil Rights Act bars discrimination on the basis of unconventional dress and appearance]; *Orloff v. Los Angeles Turf Club* (1951) 36 Cal.2d 734, 741 [227 P.2d 449] [same, as to reputation or suspicion of criminal tendencies: "mere suspicion based on past conduct and alleged reputed

activities . . . or on conversations . . . with persons considered questionable" did not justify expulsion from a business establishment].)[2] Landlords would thus risk liability whichever choice they make, and families whose ethnicity, teenage children, or mode of dress or personal appearance could, to some, suggest a gang association would face an additional obstacle to finding housing.

Plaintiff maintains that when faced with a rental applicant who looks, dresses or talks like a gang member, a landlord should obtain the applicant's criminal record, which plaintiff asserts would be readily available through a commercial investigative service. But resting a duty not to rent to gang members on the availability of such screening would merely shift the trap for landlords to different ground. The landlord would face potential liability for personal injuries if he or she failed to seek out an applicant's criminal record, conducted an insufficiently searching inquiry, or misjudged the record as not reflecting a strong propensity for gang violence and such violence later ensued. In addition, liability for discrimination could arise if the landlord treated applicants differently, depending on their ethnicity, family composition, or appearance, either in deciding whether to obtain a criminal history or in deciding what prior convictions and arrests would disqualify an applicant. The alternative—obtaining full histories on all applicants and their families, and refusing to rent to anyone with arrests or convictions for any crime that could have involved a gang—would involve significant expense and delay for the landlord and unfairly deprive many Californians of housing. Nor is the proposed screening likely to be especially effective; juvenile court records, which are generally confidential by law (Welf. & Inst. Code, § 827), are presumably not available through the services plaintiff recommends, and even adult criminal records do not necessarily reflect the circumstances of the crime from which a landlord could reliably decide whether renting to the applicant poses a threat of gang violence. We decline to impose such a burdensome, dubiously effective and socially questionable obligation on landlords, at least absent circumstances making gang violence extraordinarily foreseeable.

---

[2] California law places even greater restrictions on mobilehome park owners. For the protection of a mobilehome owner, whose home could be rendered unmarketable if the park owner could arbitrarily refuse to rent the space on which it is installed to the home's prospective buyer, the Mobilehome Residency Law limits park owners to two grounds for refusing to approve a buyer: lack of ability to pay park rent and charges, and a reasonable determination, "based on the purchaser's prior tenancies, [that] he or she will not comply with the rules and regulations of the park." (Civ. Code, § 798.74, subd. (a).) Withholding approval for any other reason subjects the park owner to civil liability. (*Ibid.*)

In this case, plaintiff argues, we do not face any issue of the difficulty for landlords in discerning gang membership, because Olsher *knew*—having been told by his manager—that the applicants for space 23 (the Levarios) were gang members. But the manager, Rogers, did not claim any particular certainty or expertise in her identification of gang members. She testified only that she "suspected" some of the young people residing in the mobilehome park were gang members, though she could not identify the gang or gangs; others she characterized as "wannabes," meaning they were not necessarily gang members but aspired to be associated with a gang. The only evidence that Rogers told Olsher anything about the Levarios was the testimony of plaintiff's grandmother, Joyce Trow, that when she complained to Rogers about people in the park Trow *thought* were gang members, Rogers said another "batch" (inferentially, the Levarios) was moving in, and that when she (Rogers) had asked George Olsher whether they could prevent this, Olsher told her to rent to them anyway because "[t]heir money is as good as yours." Even accepting plaintiff's evidence as true and drawing all legitimate inferences from it, as is usual on appellate review of a grant of nonsuit, the evidence does not come close to showing that at the time of their application Olsher *knew* the Levarios, or some of them, were violent street gang members, much less that he knew they were themselves likely to participate in violent activities at the park. Moreover, had Olsher acted on Rogers's information by withholding approval of the Levarios' purchase of the mobile-home on space 23, he might have subjected himself to potential civil liability for violation of the Mobilehome Residency Law, as suspicion of gang membership is not one of the allowed bases for disapproval under that law. (Civ. Code, § 798.74, subd. (a); see fn. 2, *ante*.)[3] Given the extraordinarily burdensome nature of the duty plaintiff seeks to impose and its likely social cost, we conclude much greater foreseeability than that demonstrated here would be required to recognize the duty not to rent housing to gang members. (See *Delgado, supra*, 36 Cal.4th at p. 243 [imposition of high burden requires heightened foreseeability]; *Rowland, supra*, 69 Cal.2d at p. 113 ["consequences to the community of imposing a duty" among factors to consider].)

---

[3] At oral argument, plaintiff's attorney suggested the occupant of the mobilehome on space 23 was a rent-paying "guest" of the homeowner and hence subject only to the guest-approval provision in the space lease, rather than to the buyer-approval restrictions in the Mobilehome Residency Law. The evidence on this point, however, indicated that Carmen Levario leased space 23 from Olsher and that Paul Levario, who occupied the home on that space, was, Rogers told another witness, "the son of the owner." Rogers also testified that the gang member whose friend shot plaintiff was "the son of the guy that owned the trailer." The record does not show Paul Levario's age, whether he rented the home from his parent or parents, or whether Olsher was ever called on to approve or disapprove Paul Levario's tenancy separately from that of his parent or parents.

## II. *Duty to Evict Gang Member Tenants*

Plaintiff contends that having rented to the Levarios, Olsher was obliged to evict them once they began to harass and annoy other residents of the park. This asserted duty requires a different analysis of burden and foreseeability than above. A landlord ordinarily has more opportunity to judge the behavior of an existing tenant than of a rental applicant. In assessing the danger an existing tenant poses, the landlord can rely on his or her own observations or those of a property manager and, where the circumstances make these reliable, on complaints of the other tenants. The risk that landlords will feel compelled to make decisions on discriminatory bases, creating social costs as well as potential legal liability, is thus lessened.

On the other hand, undertaking eviction of a tenant cannot be considered a minimal burden. The expense of evicting a tenant is not necessarily trivial, and eviction typically results in the unit sitting vacant for some period. In some municipalities—and, more to the present point, under the Mobilehome Residency Law—the landlord must provide, and may have to prove, cause for the eviction.[4] Finally, undertaking eviction of a hostile tenant, especially one involved in a violent street gang, could subject the landlord or property manager to retaliatory harassment or violence.

Not surprisingly in light of the burden involved, courts in this and other states have recognized a tort duty to evict a vicious or dangerous tenant only in cases where the tenant's behavior made violence toward neighbors or others on the premises highly foreseeable. In *Madhani v. Cooper* (2003) 106 Cal.App.4th 412 [130 Cal.Rptr.2d 778], for example, the plaintiff's neighbor in the defendant's apartment building shoved, bumped and physically blocked the plaintiff and her mother on several occasions, as well as berating them. Despite the plaintiff's frequent complaints to the defendant's property manager, no action was taken against the assailant, who ultimately pushed the plaintiff down the building's stairs, injuring her. (*Id.* at pp. 413–415.) The Court of Appeal held the landlord had had a duty to evict the assaultive

---

[4] As relevant to this case, the Mobilehome Residency Law permits termination of a tenancy for conduct that constitutes a "substantial annoyance" to other residents (Civ. Code, § 798.56, subd. (b)), conviction of specified offenses occurring in the mobilehome park (*id.*, subd. (c)), and failure to comply with a reasonable rule included in the rental agreement (*id.*, subd. (d)). The park management must include in the notice of termination a statement of the reasons "with specific facts to permit determination of the date, place, witnesses, and circumstances" supporting the termination. (Civ. Code, § 798.57.) Under section 798.56, subdivision (d), moreover, the management must give the tenant notice and seven days to cure a rule violation or must have cited the tenant for the same violation three or more times in a 12-month period.

tenant if necessary, observing that "[i]t is difficult to imagine a case in which the foreseeability of harm could be more clear." (*Id.* at p. 415.)[5]

*Andrews v. Mobile Aire Estates, supra,* 125 Cal.App.4th 578, stands as a contrasting example. There, the court held one mobilehome park resident's harassing and annoying behavior toward another (splashing mud onto the plaintiff's newly washed cars, aiming a video camera at his living room, using racial epithets and other verbal abuse) did not make his battery of the neighbor sufficiently foreseeable for imposition of a tort duty; it did not "put defendants on notice of [the assailant's] propensity for violence." (*Id.* at p. 596.)[6]

We look, then, to the circumstances of this case to see if Olsher was on notice of facts making a gang shooting involving an occupant of the

[5] See also *Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 944–945 [51 Cal.Rptr.3d 1] (landlord who allowed a former security guard to remain as a tenant, knowing "he frequented the premises while carrying a firearm and while intoxicated by methamphetamine," may have violated tort duty to exclude a dangerous tenant from the premises); *Lambert v. Doe* (Fla.Dist.Ct.App. 1984) 453 So.2d 844, 848 (where information known to a landlord showed an adolescent molester of young children was a "time bomb," the landlord violated duty of care to other tenants by not evicting the molester's family); *Dean v. St. Paul Union Depot Company* (1889) 41 Minn. 360, 362–363 [43 N.W. 54] (operator of a railway depot breached the duty to keep depot safe for passengers by allowing lessee to employ a man of "savage and vicious propensities" who had frequently assaulted those lawfully on the premises). (Cf. *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 588–593 [22 Cal.Rptr.3d 832] [failure to evict disruptive tenant may breach landlord's implied *contractual* duty to preserve other tenants' quiet enjoyment of leased premises]; *Lew v. Superior Court* (1994) 20 Cal.App.4th 866, 870–874 [25 Cal.Rptr.2d 42] [owner's management of rental property, allowing it to become a haven for drug dealing, subjected the owner to *nuisance* liability to property's neighbors].)

Apart from the question of a duty to evict, other courts have found more generally that a landowner owed tenants or other business invitees a duty to protect them from foreseeable attacks by gangs and drug dealers on the premises. (E.g., *Claxton v. Atlantic Richfield Co., supra,* 108 Cal.App.4th at pp. 335–339; *Zuniga v. Housing Authority, supra,* 41 Cal.App.4th at p. 95, questioned on other grounds in *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1138–1139 [119 Cal.Rptr.2d 709, 45 P.3d 1171]; *Martinez v. Woodmar IV Condominiums* (1997) 189 Ariz. 206 [941 P.2d 218, 223–224].)

[6] See also *Davis v. Gomez* (1989) 207 Cal.App.3d 1401, 1403–1406 [255 Cal.Rptr. 743] (although tenant had a gun and had been acting "peculiar," grumbling loudly to herself and gesturing as if "casting spells on those who walked by," her unprovoked shooting of a neighbor was not sufficiently foreseeable); *Morton v. Kirkland* (D.C. 1989) 558 A.2d 693, 694–695 (tenant's brandishing of a gun and his wife's threatening plaintiff with a cane did not make assault foreseeable); *Gill v. NY City Hous. Auth.* (1987) 130 A.D.2d 256 [519 N.Y.S.2d 364, 367, 371] (housing authority had no duty to evict a mentally ill tenant, as to whom no prior violent actions had been reported to authority). (Cf. *Anaya v. Turk* (1984) 151 Cal.App.3d 1092, 1100–1101 [199 Cal.Rptr. 187] [apartment lessee did not owe guest a duty to protect him from shooting by another guest merely because shooter was known to be an ex-convict, where no evidence was presented of prior "specific acts of violence" by shooter].) Apart from the question of a duty to evict, see *Thai v. Stang, supra,* 214 Cal.App.3d at page 1273 (roller rink had no duty to protect customer from "unforeseeable" shooting).

mobilehome on space 23 highly foreseeable. In assessing whether the facts show "heightened foreseeability" of third party crimes, our precedents have focused on whether there were prior similar incidents from which the property owner could have predicted the third party crime would likely occur, though we have recognized the possibility that "other indications of a reasonably foreseeable risk of violent criminal assaults" could play the same role. (*Delgado, supra,* 36 Cal.4th at p. 240; see also *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th at pp. 1197–1198; *Ann M., supra,* 6 Cal.4th at p. 679, fn. 7.) Evidence of two shooting incidents related to the mobilehome park was presented. In the first, nothing about the shooter was known—not identity, motive or even location; the only connection to the park was that the bullet hit a mobilehome located there. Such an occurrence would not put Olsher on notice of any particular danger at the park. In the second incident, a young man living at the park apparently discharged a handgun in a gang confrontation on an adjacent property. Olsher's knowledge of that event, through Rogers and Hicks, could be expected to serve as a reminder, if any were needed, about the general danger of escalation involved in gang confrontations. But as no occupant of the mobilehome on space 23 was involved, the incident did little to establish that gun violence by those occupants was a likely occurrence. To establish a duty to evict the Levarios, plaintiff must show that violence *by them* or their guests was highly foreseeable.

According to plaintiff's evidence, Olsher was aware of Rogers's belief that one or more members of the Levario family was in a gang; as we have explained, however, Olsher did not have a duty to refuse to rent to applicants his manager thought were gang members. The heightened foreseeability that would justify imposing a duty to evict the Levarios must be found, if anywhere, in their behavior as tenants, as reported to Olsher or his agent, Rogers. The evidence in this regard was that another park resident, Monica Preciado-Langford, had complained to Rogers that occupants of the mobilehome on space 23 or their guests had harassed her and her children by causing a pit bull to growl at them and that a person or persons she had been told lived at space 23 or 24, or both, had broken windows on her car. There was also evidence that four or five men at the mobilehome on space 23 whistled and hooted at plaintiff's sister, making her somewhat fearful, and that these incidents were reported to Rogers. Even coupled with Rogers's belief that the occupants of the mobilehome on space 23 were gang members, the possibility of gun violence established by this evidence does not rise to a level of heightened foreseeability necessary to impose a duty to evict. No one had reported that the Levarios or their guests had used, displayed or possessed a gun at the mobilehome park. Although Rogers suspected that members of the Levario family belonged to a gang, and told Olsher so, she did not identify the gang as Northside Centro. Thus, while Westside Centro graffiti might have suggested members of that group frequented the park,

Olsher had no reason to expect a confrontation, involving the Levarios, between the two rival gangs.

In these circumstances, a shoot-out between two rival gangs was not highly foreseeable, and Olsher did not have a tort duty to prevent it by evicting the Levarios. "A landlord is not obliged to institute eviction proceedings whenever a tenant accuses another tenant of harassment." (*Morton v. Kirkland, supra*, 558 A.2d at p. 695.)

### III. *Duty to Hire Security Guards and Maintain Brighter Lighting*

At oral argument, plaintiff's attorney urged this court, as an alternative to the asserted landlord duties discussed above, to affirm the Court of Appeal's determination that Olsher had a duty to hire and deploy security guards to prevent gang violence in the mobilehome park and to maintain brighter lights in the common areas.

To establish the heightened foreseeability necessary to impose a heavily burdensome duty such as hiring security guards, we have explained, the plaintiff must show the existence of prior similar incidents on the premises or other sufficiently serious "indications of a reasonably foreseeable risk of violent criminal assaults." (*Delgado, supra*, 36 Cal.4th at p. 240.) Criminal incidents at an "immediate[ly] proximat[e] . . . substantially similar business establishment" can help to show the requisite foreseeability. (*Ann M., supra*, 6 Cal.4th at p. 679, fn. 7; accord, *Delgado*, at p. 238, fn. 16.) Plaintiff argues that here the 1996 incident of gang gunplay on an adjacent empty lot, which involved a resident of the mobilehome park, together with the gang graffiti, complaints of gang members and "wannabes" living at the park, and other crimes occurring there was sufficient to put Olsher on notice that gang violence was likely to erupt at the park if no protective measures were taken. Defendants, on the other hand, emphasize that until plaintiff's shooting no known incidents of gang gun violence or hostile gang confrontations had occurred at the park itself. The mere presence of gang members, defendants argue, did not make gang violence highly foreseeable.

While insisting defendants should have hired security guards, plaintiff's counsel, at oral argument, also disavowed any claim that a guard would have been able to break up or quell the quickly developing late-night confrontation in which plaintiff was injured. Instead, counsel argued, the simple existence of guard patrols at the mobilehome park would likely have discouraged gangs from congregating there. Be that as it may, the injury in this case did not arise out of a public gang gathering. According to the only testifying eyewitness, Christina Sandoval, Paul Levario and *one* other member of the Northside gang, Manuel Viloria, were *inside* the Levario home when the car with

Westside gang members drove up and the confrontation began. Plaintiff presented no evidence to suggest that having security guards at the park would likely have deterred Levario from entertaining an individual guest inside his home, nor does common experience suggest any such effect was likely. Whatever protective effect security guards might be shown to have against violent crime in other circumstances (compare *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at pp. 775–777 with *id.* at pp. 783–784 (dis. opn. of Kennard, J.) & *id.* at pp. 788–790 (dis. opn. of Werdegar, J.)), here there was *no* evidence to support a verdict in plaintiff's favor on the issue of causation, even viewing plaintiff's evidence in the light most favorable to him.

The same is true as to maintenance of the park's common-area lighting. While plaintiff's sister testified the street lights in the area of their mobile-home did not work or were inadequate, Sandoval testified that during the argument leading up to the shooting she could see that one of the occupants of the mobilehome across the street had an object that looked like a gun, and she recognized the gunman from school. Given that the occupants of the mobilehome on space 23 were willing to engage in an armed confrontation with rival gang members where lighting allowed their weapon to be seen and themselves to be recognized, plaintiff simply has not shown that the absence of brighter lights was likely a substantial factor in producing the confrontation and ensuing gunshot.

Even viewed in a light favorable to plaintiff, the record contains insufficient evidence for a jury to find the absence of security guards and inadequate lighting were substantial factors causing the injury. Nonsuit was therefore proper.

### DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J., Concurring and Dissenting.**—This is yet another case in which this court has had to grapple with the issue of a business owner's obligation to undertake efforts to protect others from the criminal acts of third parties. Instead of providing much-needed clarity, this court's decisions in this area have engendered confusion. The core of this confusion is the improper intermingling of two distinct concepts—duty, a question for the court, and breach of that duty, a question for the jury. In treating breach as if it were part of the duty analysis, and thus an issue of law for the trial court to decide,

the court usurps the role of the jury as trier of fact. (See *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 833–844 [59 Cal.Rptr.2d 756, 927 P.2d 1260] (dis. opn. of Kennard, J.).)

Unlike the majority here, I would have the jury, not the court, decide whether defendant mobilehome park owners breached their duty to protect tenants from gang-related criminal acts. I agree, however, with the majority that under the multifactor test this court established in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561], policy considerations support the conclusion that landlords have no duty to refuse to rent to individuals suspected of being members of a street gang.

# I

Defendants George Olsher, Paule Olsher, and P&G Enterprises own the Winterland-Westways mobilehome park in El Centro, Imperial County. On November 9, 1996, at approximately 2:00 a.m., 17-year-old plaintiff Ernest Castaneda, a resident of the mobilehome park, was standing on his front porch when he was hit by a stray bullet fired during an altercation between two rival gangs. Plaintiff was an innocent bystander. Before the shooting, a number of criminal activities had occurred at the mobilehome park, as discussed below.

Beverly Rogers and her son, Rodney Hicks, lived at and managed the 60-space mobilehome park, where, from 1993 to 1996, Hicks saw drug sales once or twice a week. The lights in the mobilehome park were constantly being broken. In August 1995, a bullet from a gun fired from outside the mobilehome park went through an occupied mobilehome but did not injure anyone. In early 1996, shots were fired on property next to the mobilehome park; Hicks was told that the shots were fired during a gang fight. A boy who lived at the mobilehome park and who tried to hide a gun after that shooting incident was arrested, and defendants attempted to evict the boy's family. (The record does not disclose whether the family was actually evicted.) In the five years preceding the shooting of plaintiff, there were 26 reported thefts, assaults, arsons, and acts of vandalism. Managers Rogers and Hicks daily painted over gang graffiti on the premises.

Manager Rogers suspected that teenagers or young adults living in five of the spaces at the mobilehome park were gang members. Two or three months before plaintiff was shot, Joyce Trow, plaintiff's grandmother with whom plaintiff and his older sister lived, complained to Rogers about the presence of gang members. Rogers then mentioned that another group of gang members was moving in right across from Trow's mobilehome; Rogers said there was nothing she could do about it, explaining that when Rogers asked

defendants about renting to suspected gang members she was told: "Go ahead and rent to them. Their money is as good as yours."

A few months before plaintiff was shot, Paul Levario, a member of the Northside El Centro gang, occupied space 23 in the mobilehome park, across from plaintiff's home. Teenagers and young adults socialized with Levario in front of space 23. Manager Rogers received complaints from residents about the "gang bangers that were hanging out at space 23." They whistled and hooted at plaintiff's older sister Diana, frightening her. Sometimes they kicked a pit bull dog in the mouth to make it growl as Monica Preciado-Langford, another mobilehome park resident, walked by with her small children, ignoring her pleas to stop. She complained to manager Rogers about the group and about broken lights at the mobilehome park. She circulated a petition to the other tenants "to get the lights fixed, to take care of the graffiti [and] to initiate some sort of curfew." Thereafter, the windows of her car were smashed by, according to the other tenants, "the boys in . . . Space 23." Tenants told her that they were afraid to sign her petition. When she complained to manager Rogers, the latter repeated the response of defendant owners that nothing could be done about the situation and that she could simply move out. Defendants ignored the request of Rogers to hire security guards.

Plaintiff brought this action against defendants for premises liability. After five days of a trial before a jury, plaintiff rested his case and defense counsel made an oral motion for nonsuit. The trial court granted the motion, stating that plaintiff had "failed to show *prior similar incidents* such that a shooting herein was highly foreseeable; therefore, under *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] the landlord owed no duty to plaintiff." (Italics added.) The Court of Appeal reversed. It noted that recently in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*), a majority of this court held that a business owner has a duty to protect against the criminal acts of others not only when there had been "prior similar incidents" but also when there had been "other indications of a reasonably foreseeable risk of violent criminal assaults . . . ." (*Id.* at p. 240.) Applying *Delgado,* the Court of Appeal concluded that the evidence was sufficient to have the jury determine whether defendant landlords breached an obligation to take steps to protect plaintiff from the criminal acts of others.

## II

One of the more difficult questions in negligence law is determining the existence and scope of the duty of a business owner to protect others from the criminal acts of third parties. (*Delgado, supra*, 36 Cal.4th at pp. 250–251

(dis. opn. of Kennard, J.).) As I noted in *Delgado,* the law has developed two basic approaches to this question: the totality of circumstances test and the prior similar incident test. "The totality of circumstances test applies general principles of negligence; it takes into account such things as the nature, condition, and location of the premises; it views foreseeability as a question of fact that turns on the evidence. The second approach takes the view that a business owner has no duty in the absence of a prior similar incident on the premises; in other words, it views foreseeability as requiring the occurrence of a prior similar event before a duty to take precautionary measures can be imposed on the business owner. (2 Dobbs, The Law of Torts (2001) § 324, pp. 877–878.)" (*Delgado, supra,* 36 Cal.4th at p. 253 (dis. opn. of Kennard, J.).)

Before this court's 1985 decision in *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112 [211 Cal.Rptr. 356, 695 P.2d 653] (*Isaacs*), our state Courts of Appeal were divided on which of those two tests to apply. (*Id.* at pp. 125–129.) *Isaacs* rejected the prior similar incident test in favor of the totality of the circumstances test. (*Id.* at pp. 125–127, 130.) But in 1993, in *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th 666 (*Ann M.*), which involved a rape by an unknown assailant at a store, this court changed course, and held that in the absence of a prior similar incident a business owner had no duty to provide security guards (*id.* at p. 679).

In 2005, I pointed out in my dissenting opinion in *Delgado*: "Anyone reading this court's decisions in *Ann M., supra,* 6 Cal.4th 666, *Sharon P. v. Arman, Ltd.* [(1999)] 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121], and *Wiener v. Southcoast Childcare Centers, Inc.* [(2004)] 32 Cal.4th 1138 [12 Cal.Rptr.3d 615, 88 P.3d 517], would conclude that (1) the prior similar incident rule applies to premises liability claims against business owners for failing to take precautions against possible *future criminal* conduct of third parties when the conduct is a criminal assault by a third party . . . ." (*Delgado, supra,* 36 Cal.4th at p. 255 (dis. opn. of Kennard, J.).) The Court of Appeal here made the same point when it stated that "prior to *Delgado,* there was no clear authority that anything other than a prior similar incident occurring on the property would be sufficient to indicate a 'reasonably foreseeable risk of violent criminal assaults.' (*Delgado, supra,* 36 Cal.4th at p. 239.)"

But in *Delgado, supra,* 36 Cal.4th 224, a majority of this court stated that the "plaintiff was required to demonstrate heightened foreseeability in the form of prior similar incidents (*or* other indications of a reasonably foreseeable risk of violent criminal assaults . . .)" that is to be balanced against the burden imposed (*id.* at p. 244, original italics; see maj. opn., *ante,* at p. 1222). The reference in *Delgado* to "other indications of a reasonably foreseeable risk of violent criminal assaults" balanced against the burden imposed on the

defendant business owner is just another way of describing the totality of circumstances test. Thus, *Delgado* purports to recognize *both* tests at the same time. But both tests cannot be applied simultaneously. Why? Because the totality of circumstances test necessarily includes the prior similar incident test. Under the totality of circumstances test—in essence the general rule in negligence that everyone has an obligation to act as a reasonable person in similar circumstances—the existence or nonexistence of a prior similar incident is just one of many possible "indications" of foreseeability of a violent criminal assault. (*Isaacs, supra,* 38 Cal.3d at p. 135.)

Thus, the crux of the majority's holding in *Delgado, supra,* 36 Cal.4th 224, is that a business owner owes a legal duty to protect others from the criminal acts of third parties and that the scope of that duty is to act as a reasonable person in similar circumstances. Deciding the existence of a duty and its scope or " 'the standard of conduct to which the duty requires the defendant to conform' " (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167]) are questions of law for the court (*ibid.*; *Ann M., supra,* 6 Cal.4th at p. 674; *Isaacs, supra,* 38 Cal.3d at p. 124). But "[o]nce the court has formulated the standard, its application to the facts of the case is a task for the trier of fact if reasonable minds might differ as to whether the defendant's conduct has conformed to the standard." (*Ramirez v. Plough, Inc., supra,* 6 Cal.4th at p. 546; see Rest.2d Torts, § 328C, subd. (b); see also Rest.2d Torts, § 328B, com. g, p. 154.) Stated differently, whether there has been a *breach* of the duty is a question for the jury, not the court.

Because of the elasticity of the concept of duty, it is always possible for a court to characterize and analyze every issue in a negligence case in terms of duty. (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th at p. 839 (dis. opn. of Kennard, J.); 1 Dobbs, The Law of Torts (2001) § 226, p. 578, § 230, pp. 584–585; Prosser & Keeton on Torts (5th ed. 1984) § 53, p. 356.) But doing so is improper because it conflates the legal standard applicable to conduct (a decision for the court) with the factual question of whether that standard has been breached (a decision for the jury). (See, e.g., *Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th at pp. 837–838 (dis. opn. of Kennard, J.); 1 Dobbs, The Law of Torts, *supra,* § 226, p. 577; see Rest.2d Torts, §§ 328B, 328C.)

In determining the nature and scope of the duty owed, the *court* formulates a rule of *general* applicability as to what conduct is required in a wide variety of similar circumstances, that is, it states a rule of law applicable to a *category* of cases. (See, e.g., Rest.2d Torts, § 328C & com. b, pp. 155–156; Rest.3d Torts, Liability for Physical Harm (Proposed Final Draft No. 1) § 8 & com. b, pp. 114–115; 1 Dobbs, The Law of Torts, *supra,* § 226, pp. 577–578; Prosser & Keeton on Torts, *supra,* § 37, pp. 236–237; see Esper & Keating,

*Abusing "Duty"* (2006) 79 So.Cal. L.Rev. 265, 324–327.) But whether the defendant's *specific* acts or failures to act satisfied that standard, that is, whether there was a breach of the duty owed to the plaintiff, is a question of "fact" for the jury to decide. "Put more broadly, the difference between the doctrines comes to this. 'Breach/No breach' involves the evaluation of a specific defendant. . . . 'No duty,' however, is not a matter of making an evaluation of the specific facts of this case. Rather, it is a global determination that, for some overriding policy reason, courts should not entertain causes of action for cases that fall into certain categories." (Sugarman, *Assumption of Risk* (1997) 31 Val.U. L.Rev. 833, 843.) Or as others have explained: "When reasonable people might disagree over whether the defendant exercised reasonable care in the circumstances at hand, long-settled doctrine holds that it is for juries—not judges—to decide the issue. Articulation of the law is for judges; application of the law is for juries." (Esper & Keating, *Abusing "Duty," supra,* 79 So.Cal. L.Rev. at p. 269, fn. omitted.)

The justification the majority here offers for intermingling the two different concepts—duty and breach—is that "foreseeability" is an element of the duty determination and that therefore it is for the court to determine the foreseeability of a specific event and evaluate the burden that would be imposed by a "duty." (Maj. opn., *ante,* at pp. 1213–1215.)

But foreseeability serves several functions in negligence law. "The foreseeability of a particular kind of harm plays a very significant role in this [duty] calculus (see *Dillon* v. *Legg* [(1968)] 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912]), but a *court's* task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. [¶] The *jury,* by contrast, considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624], 1st & 4th italics added; see generally Rest.3d Torts, Liability for Physical Harm (Proposed Final Draft No. 1) § 7, com. j, pp. 97–99 [rejecting approach that foreseeability has any role in determining whether a duty exists].)

The majority here goes astray in treating the separate elements of duty and breach as if they were one and the same. (See *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 495 [63 Cal.Rptr.2d 291, 936 P.2d 70] (dis. opn. of

Kennard, J.); *Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th 814, 837–838 (dis. opn. of Kennard, J.).) According to the majority, "duty analysis" is for *the court,* whether trial or appellate, to determine the *specific* measures a plaintiff asserts the business owner defendants should have taken to protect a plaintiff from harm, followed by *the court's* analysis of financial and social burdens flowing from those *specific* measures, followed by *the court's* identification of the nature of third party conduct and *the court's* assessment of *how* foreseeable the conduct was. Then, according to the majority, it is for *the court* to compare the burden and foreseeability to determine the existence of duty in each case. (Maj. opn., *ante,* at pp. 1213–1215.) No! Although, as I noted earlier, it is for the court to determine the existence of duty and to articulate the scope of that duty as a rule of general applicability, it is for *the jury,* as trier of fact, to decide whether the defendant's specific conduct breached the legal duty imposed. Under the majority's approach, duty is "a live issue in every case," making it "impossible to draw a principled line between the provinces of judge and jury." (Esper & Keating, *Abusing "Duty," supra,* 79 So.Cal. L.Rev. at p. 269.) This introduces "a pervasive instability into negligence law, placing the standard governing legal conduct perpetually up for grabs." (*Id.* at p. 272.)

## III

The general rule is that all persons owe a duty to exercise reasonable care towards others unless there is a statutory provision declaring an exception or unless public policy considerations support recognizing an exception. (*Rowland v. Christian, supra,* 69 Cal.2d at p. 112.) Thus, to determine whether a landlord may be liable to a plaintiff, three questions need to be answered. First, do policy considerations justify holding that the landlord defendant owed no duty to the plaintiff? Second, if not, what is the scope of that legal duty? Third, did the plaintiff present sufficient evidence such that reasonable persons could differ as to whether the defendant breached that duty?

I agree with the majority that policy considerations support its conclusion that landlords do not have a duty to refuse to rent to persons suspected of being members of a street gang. As the majority points out, the landlord's inability to ascertain with certainty a prospective tenant's background, the risk that landlords attempting to screen out gang members may use arbitrary or discriminatory selection methods, and the landlord's potential liability to prospective tenants erroneously suspected of gang associations (maj. opn., *ante,* at pp. 1216–1217) together warrant recognizing an exception to the landlord's general duty to act as a reasonable person.

But I disagree with the majority on its other holdings. No policy considerations or statutory provisions warrant an exception to the duty of a business owner to act reasonably to protect others from the *criminal acts of third parties*. The pertinent inquiry is whether plaintiff produced evidence sufficient to warrant submitting to the jury the question of whether defendant landlords failed to act as reasonable persons in similar circumstances. As I have observed in the past, if reasonable persons might differ as to whether a defendant's conduct has conformed to that standard, then the matter should be submitted to the jury. (*Ramirez v. Plough, Inc., supra,* 6 Cal.4th at p. 546.) " 'If there is any doubt, it is the duty of the court to let the case go to the jury.' " (*Golceff v. Sugarman* (1950) 36 Cal.2d 152, 153 [222 P.2d 665].)

Here, plaintiff's evidence is sufficient to warrant submission to the jury. As mentioned on pages 1210–1211, *ante,* in the five years before plaintiff was shot, there had been 26 reported thefts, assaults, arsons, and acts of vandalism at defendants' mobilehome park. The lights in the mobilehome park were constantly being broken and in need of repair. Defendants' property managers received several complaints from tenants about harassment and intimidation by gang members on the property. The teenagers and young adults that congregated in front of the mobilehome at space 23, including gang member Paul Levario, harassed plaintiff's sister and kicked a pit bull dog in the mouth to make it growl at resident Monica Preciado-Langford as she passed by with her small children. Daily, the property managers were painting over gang graffiti. And there had been two shootings in or near the mobilehome park, one of which was associated with gang activity involving a park resident. In my view, this evidence is such that reasonable minds could conclude that defendant landlords breached their duty to act reasonably by failing to remove dangerous gang members from the mobilehome park or take other security measures.

I also do not agree with the majority that plaintiff failed to produce sufficient evidence of causation. (Maj. opn., *ante,* at p. 1222.) Legal cause requires only that the act or failure to act be one of the causes, not the only cause, of the injury and it does not require that the exact means of causation be known or capable of precise prediction. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239–1240 [135 Cal.Rptr.2d 629, 70 P.3d 1046]; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 783–784 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (dis. opn. of Kennard, J.); *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

Accordingly, like the Court of Appeal, I conclude that defendant landlords "ha[d] a duty to take reasonable and appropriate measures to attempt to protect residents from potential gang violence" and that the evidence is sufficient to submit to the jury the question of whether defendants breached this duty. I would affirm the judgment of the Court of Appeal.[1]

Appellant's petition for a rehearing was denied October 17, 2007, and the opinion was modified to read as printed above. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

[1] The judgment of the Court of Appeal did not address the question of whether defendants could be held liable for refusing to rent to suspected gang members. It reversed the trial court's judgment and remanded the case with directions that the trial court "instruct the jury that a property owner who is aware of ongoing criminal gang activity occurring on his property has a duty to take reasonable and appropriate measures to attempt to protect residents from potential gang violence." I agree with the judgment of the Court of Appeal as so stated.