[No. D049934. Fourth Dist., Div. One. May 14, 2008.]

MATTHEW A. ERICSON, as Personal Representative, etc., Plaintiff and Appellant, v.
FEDERAL EXPRESS CORPORATION et al., Defendants and Respondents.

CₒᵤNSEL

Jon R. Williams for Plaintiff and Appellant.

Higgs, Fletcher & Mack, John Morris, Susan E. Basinger and Kathryn A. Martin for Defendants and Respondents.

OₚɪNION

**McCONNELL, P. J.**—In this premises liability action, Matthew A. Ericson, who substituted into this appeal after the death of his brother, plaintiff Mark Ericson,[1] appeals a summary judgment for defendants, Federal Express Corporation (Federal Express) and FedEx Ground Package System, Inc. (FedEx Ground).[2] Ericson contends the court erred by determining FedEx had no duty to protect Mark against a third party assault and robbery in its parking lot, based on the lack of prior similar criminal conduct on the premises or other evidence the assault was reasonably foreseeable. Ericson also contends the court erred by finding FedEx's implementation of some security measures did not increase the risk of harm to Mark or cause his detrimental reliance. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Mark worked for Coast Trucking (Coast), an independent contractor that provided trucking services to FedEx at its terminal on Olson Drive in San Diego. The terminal building is located on a large property, with Federal Express occupying the east side of the parking lot and FedEx Ground occupying the west side of the parking lot. There are driveways on the east and west sides of the building, and at the relevant time a guard was stationed in a small building at the east entrance to the parking lot to monitor vehicles entering and exiting the east driveway. The south side of the facility abuts Olson Drive, and the other three sides of the facility are bounded by undeveloped and unfenced canyon areas.

Mark was assigned to FedEx Ground, and his shift was between approximately 3:00 p.m. and 5:00 a.m. As with all Coast employees, FedEx Ground required Mark to park his personal car and his work truck in a designated space at the "far rear of the facility," at the northeast corner of the parking lot on the unfenced canyon rim. The area was dimly lit, with the only lights being attached to the FedEx building. The area was also isolated from FedEx

---

[1] To avoid confusion we use Matthew's last name and Mark's first name.

[2] When appropriate we refer to the defendants together as FedEx.

employees and business activities. When Mark began his shift, he was required to drive his car to a point near his assigned space, idle his car while he pulled the truck out, and then move his car into the space. At the end of his shift, when it was dark, he had to reverse the procedure.

In contrast, Federal Express and FedEx Ground allowed their employees to park their personal cars and work trucks directly east and west of the terminal building. Those areas had greater activity, including the regular arrival and departure of cargo trucks, and the loading and unloading of trucks.

On June 27, 2003, at approximately 4:30 a.m., Mark returned to his assigned parking space at the FedEx terminal. About 6:00 a.m., a FedEx employee found Mark unconscious on the ground with a pool of blood under his head. Mark's car, a Corvette, was idling nearby with the keys locked inside. There was a brown wallet on the seat of the car that did not belong to him, and the identity of its owner was apparently never established. Mark carried a black wallet that was not stolen. His backpack was missing, which contained a CB radio, a portable CD player, CD's and other items.

Paramedics took Mark to the emergency room, and he was bleeding from an eight-centimeter scalp laceration. He also suffered a concussion with severe postconcussive vertigo. Mark did not remember the assault.

Mark sued FedEx for premises liability. FedEx moved for summary judgment, arguing it owed Mark no duty to prevent the assault because there were no prior assaults on the property, and alternatively, any breach of duty was not the legal cause of his injuries. FedEx produced evidence that between January 3, 2001, and June 22, 2005, 59 calls were made to the San Diego Police Department pertaining to incidents on the FedEx property.[3] The majority of calls concerned false burglary alarms. In January 2001 the police responded to a report that FedEx was holding an employee for theft. In October 2001 the police responded to a call that FedEx was holding an adult male for theft. In December 2002 the police responded to a dispute between FedEx employees over one of their wives, in which an acquaintance of the supposedly wronged man confronted the other man with a gun. In January 2003 the police responded to the report of a stolen vehicle, but the owner had misplaced it.

FedEx also submitted the declaration of Andrew Flores, a senior security specialist for FedEx Ground. The declaration stated it was customary for FedEx Ground employees to leave their personal cars "at or near the

---

[3] As to the issue of foreseeability, calls made after the date of the assault on Mark, June 27, 2003, were immaterial.

terminal" during work hours, and "I am not aware of any attacks or related violence associated with an employee's personal car being left at the terminal." The declaration also stated that at the time of the assault on Mark, Flores had worked for FedEx for approximately five years and never received any report of prior criminal violence or of "suspicious persons being on the property."

Further, FedEx submitted the declaration of Randy Wright, a senior security specialist for Federal Express who had been assigned to FedEx's San Diego terminals for approximately 10 years. Wright also never received any report of prior criminal violence or of "suspicious people" being at the FedEx facility on Olson Drive.

In opposition to the motion, Mark argued that even if no "heightened foreseeability" existed because of the lack of prior violent incidents, at a minimum, FedEx had a duty to take simple steps to protect him from third party criminal conduct. He argued the assault was reasonably foreseeable because FedEx Ground required him to park in an isolated area, had notice of transients living in the nearby canyons, ignored requests from Coast's owner Johnny Daniel to control the parking lot, breached its own policies requiring parking lot checks, and did not include his designated parking space in its security inspections. Mark argued his assault could have been prevented by, for instance, FedEx allowing him to park on the east or west side of the FedEx building where it allowed its own employees to park. Additionally, Mark argued defendants increased the risk of harm to him by negligently undertaking security at the facility.

Mark relied on his deposition testimony that one afternoon about three months before the assault, he saw a man come out of the canyon onto the rear of the FedEx property about 50 feet from his parking space, and rummage around in a trash bin. He described the person as a "[d]irty, white male, raggedy clothes, unshaven, probably six-foot tall and carrying his sleeping bag and whatever possessions he had with him." Mark and the man did not speak or make eye contact, and Mark perceived no threat and made no report to FedEx.

Within about two months of that incident, and in the early morning, Mark saw a man by the entrance to the FedEx terminal, who immediately left the property when trucks began arriving. Mark said it was difficult to see the man because of the hour, but he was "unshaven, dirty, [and] did not have any possessions with him, but he was looking at the cars on the property." Mark did not speak to the man.

Mark also testified he had seen cameras on the corners of the FedEx building at the "upper part of the roof." He testified he had no information

regarding the purpose of the cameras or what they may have been looking at. In a declaration, Mark stated he knew a security guard was posted on the east side of the FedEx facility, and that cameras were mounted on the exterior of the building, and "I believed that the guard and the cameras were provided for the security of the property and people, including myself, at the terminal. I was never told that the cameras or the guards were not there for my protection." It is undisputed that the camera system was inoperative when Mark was attacked.

Mark also submitted the declaration of Daniel. The declaration stated that "on many occasions both before and after June 27, 2003, [I] observed people who I believed to be homeless, transient and otherwise without business with Coast [or FedEx] walking around the [f]acility grounds, including the parking lot." The declaration stated that because of the lack of fencing around the parking lot, the lack of lighting in Coast's designated parking spaces, the isolated location, the presence of transients, and the requirement that his employees arrive or leave the facility in darkness, he was concerned for their safety. He feared his drivers were "vulnerable to criminal activity, including robbery, theft or assault."

Daniel's declaration also stated that before Mark's assault, he told several FedEx managers, including FedEx Ground's former terminal manager Todd Yesland, that FedEx needed to "address and eliminate" the presence of transients or other people without business with Coast or FedEx. Daniel requested that a fence be installed around the parking lot to prevent unauthorized persons from entering the grounds from the canyons, and that FedEx's existing security guards walk the parking lot perimeter or that FedEx hire additional security guards to ensure the safety of Coast employees.

Additionally, Mark submitted a declaration by Yesland that stated his duties included oversight of all terminal operations for FedEx Ground. The declaration also stated he had been informed of transients on the property, including the parking lot. Yesland could not recall when he received the information or from whom he received it, but he did not dispute that Daniel gave him the information before the assault on Mark. Yesland did not convey the information to FedEx Ground's senior security specialist, Flores.

The Yesland declaration also stated that within about 18 months of the time in 1997 when Yesland became terminal manager, "I perceived the need for a gate to be installed at the [west] entrance to the . . . terminal both to protect ground cargo and to protect personnel from physical harm from intruders or criminals who may enter the property to steal trailers or their contents." Yesland informed Flores of the need for a gate, but none was installed.

Flores testified in his deposition that under FedEx protocol he was to be advised of "[a]ny type of security issues." Flores testified that if Yesland knew transients were encamped in the canyons abutting the FedEx facility, and had entered onto FedEx property and rummaged through the dumpster, he should have informed Flores. If Flores had that knowledge, he would "let [homeless persons] know that they're not welcome here" and ask the police to investigate, to keep the property secure and personnel safe.

The court took the matter under submission after a September 22, 2006 hearing. On September 29, the court ruled in favor of FedEx, and on November 2, judgment was entered for FedEx.

## DISCUSSION

## I

### Standard of Review

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A defendant satisfies this burden by showing " 'one or more elements of' the 'cause of action' . . . 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*) We review the trial court's ruling on a summary judgment motion independently, considering all the evidence set forth in the moving and opposing papers except that to which objections have been sustained. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1472 [38 Cal.Rptr.3d 653].)

## II

### Liability for Third Party Criminal Acts

## A

### Legal Principles

"To prevail on [an] action in negligence, plaintiff must show that defendants owed [him or] her a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of [his or] her injuries." (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188 [91 Cal.Rptr.2d 35,

989 P.2d 121] (*Sharon P.*), disapproved on other grounds in *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 853, fn. 19.)

■ Ordinarily, there is no duty to protect others from third party criminal activity. (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334].) Courts, however, "have recognized exceptions to the general no-duty-to-protect rule," one of which is the " 'special relationship' doctrine." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*).) "Courts have found such a special relationship in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees." (*Ibid.*) Based on the special relationship, "commercial proprietors . . . are required to 'maintain land in their possession and control in a reasonably safe condition' and . . . this general duty includes taking 'reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.' " (*Id.* at p. 237.)

■ The existence and scope of a duty are questions of law for the court's determination, and foreseeability is a critical factor in the analysis. When foreseeability is analyzed to determine the existence or scope of a duty, foreseeability is also a question of law. (*Delgado, supra,* 36 Cal.4th at p. 237.)[4]

In *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678–679 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*), the court instructed that "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' [Citation.] Or, . . . duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures."

The plaintiff in *Ann M.* was raped at her place of employment, a business located in a secluded area of the defendant's strip mall. (*Ann M., supra,* 6

---

[4] "[F]oreseeability is a question of fact, which must be decided by a trier of fact, in any case about which reasonable minds can differ within the more focused, fact-specific settings of breach of duty and causation." (*Lopez v. McDonald's Corp.* (1987) 193 Cal.App.3d 495, 507, fn. 6 [238 Cal.Rptr. 436]; see *Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

Cal.4th at p. 670.) The court held violent criminal assaults were not sufficiently foreseeable to impose a duty on the defendant to provide security guards in the mall's common areas, as the defendant had no notice of prior similar incidents on the premises. (*Ann M., supra,* 6 Cal.4th at p. 679.) The court concluded that "[n]either the evidence regarding the presence of transients nor the evidence of the statistical crime rate of the surrounding area is of a type sufficient to satisfy this burden." (*Id.* at p. 680.)

■ The *Ann M.* court concluded that while certain circumstances may require an owner to hire security guards to satisfy the duty of care, that measure will almost always be considered a significant burden, given the financial and social costs, and the uncertainty that patrols will deter crime. The court explained, "[u]nfortunately, random, violent crime is endemic in today's society," and " '[n]o one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.' " (*Ann M., supra,* 6 Cal.4th at pp. 678, 679.) Accordingly, when the measure at issue is the hiring of security guards, evidence of prior similar incidents of crime on the owner's premises is ordinarily required to prove the requisite degree of foreseeability, although criminal incidents at a nearby similar business may help establish foreseeability. (*Id.* at p. 679 & fn. 7.)

In *Sharon P., supra,* 21 Cal.4th 1181, an unknown assailant sexually assaulted the plaintiff in a commercial building's underground parking garage. The plaintiff contended her assault was highly foreseeable, regardless of the absence of prior violent crime, because underground parking structures are inherently dangerous, there were prior bank robberies in the building, and there were prior violent crimes in the surrounding area. She asserted that the hiring of security guards was required, and at a minimum the defendants were required to provide assertedly simple and less burdensome means of protection, such as keeping the garage brightly lit and clean, hooking up a previously installed security camera, and requiring existing personnel to periodically walk through the garage. (*Id.* at pp. 1195–1196.)

The court applied the heightened foreseeability test and concluded there was insufficient evidence of the foreseeability of a violent attack. The court noted that sexual assault is not a reasonably foreseeable risk associated with bank robberies, and there was no other evidence of crimes against property or persons on the premises. (*Sharon P., supra,* 21 Cal.4th at p. 1197.) The court rejected the notion that underground parking garages are inherently dangerous and thus require security guards. (*Id.* at p. 1191.) The court also concluded the defendants were not required to undertake the plaintiff's other proposed measures, because it was questionable whether they were actually less burdensome than hiring security guards, or would have protected against the sexual assault. (*Id.* at p. 1196.)

■ In *Delgado, supra*, 36 Cal.4th 224, 242, the court affirmed that "heightened foreseeability" is not always required to impose a duty on a proprietor based on a special relationship. Rather, a "sliding-scale balancing formula" applies as discussed in *Ann M.* and *Sharon P. (Delgado, supra*, at p. 243 & fn. 24.) "In circumstances in which the burden of preventing future harm caused by third party criminal conduct is great or onerous . . . heightened foreseeability—shown by prior similar criminal incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location—will be required. By contrast, in cases in which harm can be prevented by simple means or by imposing merely minimal burdens, only 'regular' reasonable foreseeability as opposed to heightened foreseeability is required." (*Id.* at p. 243, fn. 24.)

In *Delgado,* the defendant's bar employed two security guards, one inside the bar (Nichols) and the other in the bar's parking lot. When the plaintiff (Delgado) and his wife were at the bar late one evening, another patron (Joseph) and three or four of his companions and Delgado got into a staring match. Delgado eventually became uncomfortable and decided to leave. Evidence was presented that Delgado's wife expressed concern to Nichols that " 'there was going to be a fight' "; Nichols observed hostile stares between Delgado and Joseph and his companions and concluded a fight was imminent; Nichols determined it would be best to ask Delgado and his wife to leave, and he asked them to do so; they left the bar, but Nichols did not escort them to their car in the parking lot; when they began walking to their car, the outside guard was no longer present and 12 to 20 men were standing in the lot, which was contrary to the bar's policy of dispersing such gatherings; and Joseph and his companions followed Delgado and accosted him, with the other men in the lot joining in. (*Delgado, supra*, 36 Cal.4th at p. 231.)

The court held the bar had no duty to provide additional guards or undertake similarly burdensome measures, because there was no evidence of prior similar crimes or other indications of a foreseeable risk of a violent criminal assault. The court, however, held the bar had a duty "to respond to events unfolding in its presence by undertaking reasonable, relatively simple, and minimally burdensome measures" to address the imminent danger to Delgado, such as Nichols dissuading Joseph and his group from following Delgado to the parking lot or confirming that the outside guard was at his station. (*Delgado, supra*, 36 Cal.4th at p. 245.) The court concluded it was foreseeable that an assault would occur absent separation of Joseph and his companions from Delgado. (*Id.* at pp. 245–246.)

■ In *Castaneda v. Olsher* (2007) 41 Cal.4th 1205 [63 Cal.Rptr.3d 99, 162 P.3d 610], the court clarified that the duty analysis requires the court, whether trial or appellate, to undertake the following analysis: " 'First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord.' " (*Castaneda v. Olsher*, at p. 1214, quoting *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285 [12 Cal.Rptr.3d 846].)

■ When a " 'regular' reasonable foreseeability" (*Delgado, supra,* 36 Cal.4th at p. 243, fn. 24) test is applicable, the court must determine whether " 'the degree of foreseeability is high enough to charge the defendant with the duty to act on it. If injury to another " 'is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct' " [citations], we must label the injury "reasonably foreseeable" and go on to balance the other *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]] considerations.' [Citation.]" (*Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 406 [1 Cal.Rptr.3d 762].)[5]

---

[5] In *Rowland v. Christian, supra,* 69 Cal.2d at page 113, the court explained that in addition to foreseeability, courts also balance the following other factors in determining the existence and scope of a duty: "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." Although the most important consideration in establishing duty is foreseeability, " '[t]hese other factors may dictate against expanding the scope of a landowner's duty to include protecting against third party crime, even where there is sufficient evidence of foreseeability.' " (*Delgado, supra,* 36 Cal.4th at p. 237, fn. 15.)

In *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519 [53 Cal.Rptr.3d 700] (*Ambriz*), this court recently applied the balancing formula of *Delgado* in the context of a legal malpractice case, as relevant to the "case-within-a-case" issue. (*Ambriz*, at pp. 1532–1535.) The defendants argued the superior court properly granted them summary judgment on the ground the plaintiff (Ambriz) could not establish the elements of duty or causation in her premises liability action. (*Id.* at pp. 1532, 1535.)

Ambriz lived at Casa Escondida, an apartment complex. As a condition of receiving a variance from the city that allowed the apartment to exceed typical density limits, Casa Escondida is required to rent to senior citizens or disabled persons, and its tenants are lower income and elderly, and many of them are women. In January 2002 Ambriz was raped by an intruder. The evidence showed that before the rape a number of transients had been congregating outside Casa Escondida, they regularly made their way onto the complex grounds, and some of them slept on benches on the grounds and showered in the poolside shower. Further, male intruders had entered the complex's buildings. The rapist was a transient who was seen inside Ambriz's building more than 10 times before the rape. He regularly asked residents, including Ambriz, for money, and in December 2001 he became more aggressive and began to frighten Ambriz and other tenants. She reported to management that doors to the buildings would not lock, and the transient was scaring her. Management told her it would " 'take care of it.' " (*Ambriz, supra*, 146 Cal.App.4th at pp. 1523–1524.) A police detective testified there was no evidence of forced entry and thus the rapist likely entered the building through an unlocked door. (*Id.* at p. 1524.)

We concluded that because "requiring a landlord to use, maintain and/or repair already existing doors and locks imposes only a minimal burden on the landlord," Ambriz was not required to show heightened foreseeability, but rather " ' "regular" reasonable foreseeability.' " (*Ambriz, supra*, 146 Cal.App.4th at p. 1534.) We held that Casa Escondida's management "could foresee that a resident in Casa Escondida's vulnerable population might fall victim to an assault by an unauthorized intruder." (*Id.* at p. 1535.) We noted that Casa Escondida had previously installed locks to maintain a " 'controlled access' residential facility, evidencing a concern on the part of Casa Escondida's management regarding the residents' safety, and they were on notice that their security had been repeatedly breached." (*Ibid.*, fn. omitted.)

B

*Analysis*

Ericson concedes Mark produced no evidence to satisfy the heightened foreseeability test, and thus FedEx had no duty to undertake burdensome measures to prevent the assault, such as having security guards patrol the area of his designated parking space or installing a fence around the entire parking lot. Ericson contends that under *Delgado*'s sliding-scale balancing formula, FedEx was required to undertake minimally burdensome measures, including (1) reporting to FedEx Ground's senior security specialist, Flores, "the presence of intruders and the existence of criminal activity in the terminal parking lot, and the presence of transients living in the canyon adjacent to the northeast corner of that lot"; (2) warning invitees such as Mark "of those known hazards," including "known criminal activity on the premises," and that FedEx was not providing security to protect them "from intruders or other known risks of harm"; and (3) permitting Mark "to park in another portion of the terminal parking lot."[6]

█ We agree that the proposed measures can be considered minimally burdensome. We conclude, however, that the third party assault was not foreseeable under even the " 'regular' reasonable foreseeability" test (*Delgado, supra*, 36 Cal.4th at p. 243, fn. 24), and thus the degree of burden is immaterial. "If there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another." (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 150 [42 Cal.Rptr.3d 519].)

The supposed criminal activity in the parking lot was apparently trespassing by transients. In other words, the presence of transients and claimed criminal activity were one and the same. Mark saw one transient about 50 feet from his designated parking space and another at the entrance to the FedEx facility, who apparently was not trespassing, and Daniel saw an unspecified number of transients in the parking lot. In contrast to the situation in *Ambriz*, neither Mark's declaration nor deposition testimony indicates the transients he saw were aggressive or threatening. To the contrary, Mark

---

[6] Ericson asserts that Daniel asked FedEx Ground to allow Coast employees, including Mark, to park in another part of the parking lot. Daniel's declaration, however, does not state that. Rather, it states Daniel asked FedEx Ground to install a fence around the parking lot and to have existing security guards walk the parking lot. The declaration also stated that in the absence of those steps, "I believe that it would have been safer to permit me and my employees to park our personal cars and tractors on the east or west sides of the building, which would have placed us in view of other employees and security personnel, and where other such vehicles regularly were parked." Perhaps Daniel asked FedEx Ground for permission to park somewhere else, but his declaration does not state so.

testified he did not feel threatened by the one transient he saw in the parking lot. Further, Daniel's declaration did not indicate the transients he saw were aggressive or threatening. Rather, it stated the transients he saw were "walking around the [f]acility grounds, including the parking lot." Additionally, there is no evidence transients were panhandling on FedEx's property.

Ericson also points to thefts at FedEx, and asserts it was foreseeable that additional thefts would occur and be accompanied by assaults. Ericson asserts thefts occurred in the parking lot, but there is no evidence as to where they occurred on the FedEx property. In *Cohen v. Southland Corp.* (1984) 157 Cal.App.3d 130 [203 Cal.Rptr. 572], this court concluded that prior armed robberies of 7-Eleven stores made the armed robbery at issue foreseeable, and it was also foreseeable that a robber may injure a customer during a robbery. (*Id.* at pp. 139–140.) Here, however, a violent assault was not reasonably foreseeable because there is no indication that any thefts involved force, weapons or even any type of intimidation. Moreover, one, if not both, of the thefts evidenced by police reports that occurred prior to Mark's assault were by FedEx employees, and employees would not reasonably be expected to assault a coemployee or independent contractor for FedEx in conjunction with stealing. A FedEx internal memorandum stated that in February 2003, 60 cell phones were lost "due to weekend pilferage's" (*sic*), which also indicates employee crime. Further, the lone domestic incident was between coemployees and an acquaintance of one of the employees, and it would not foretell a violent third party assault by a transient.

Ericson asserts the trial court ignored *Delgado*'s "sliding-scale balancing formula" (*Delgado, supra*, 36 Cal.4th at p. 243) because it rejected his duty argument based on the lack of prior similar violent assaults on the FedEx property. He submits that since he proposes only minimally burdensome security measures, the lack of prior similar incidents was not dispositive. The court's ruling states the "lack of prior similar violent criminal activities or evidence that such violent criminal activities were reasonably foreseeable precludes the finding of the existence and scope of the duty owed by the defendants to hire security guards and/or functional exterior surveillance cameras to monitor transient and/or homeless activity at the parking facility."

■ The ruling does appear to be based on a "heightened foreseeability" analysis, as it addresses only substantially burdensome security measures and does not address the minimally burdensome measures such as allowing Mark to park in a different part of the parking lot. However, " '[n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it

must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10], disapproved on other grounds in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 944 [154 Cal.Rptr. 503, 893 P.2d 200].) ▮ To any extent the court erred by relying solely on a "heightened foreseeability" test, reversal is not warranted. This case boils down to a few sightings of nonthreatening transients on the FedEx property, and that does not satisfy even the " 'regular' reasonable foreseeability" test (*Delgado, supra*, 36 Cal.4th at p. 243, fn. 24).[7]

## III

### *Negligent Undertaking Doctrine*

Alternatively, Ericson contends summary judgment was improper because FedEx increased the risk of harm to Mark by negligently undertaking security measures or by negligently failing to advise Mark it was not taking any such measures for his benefit. Ericson asserts Mark reasonably relied on the presence of security personnel and surveillance cameras at the FedEx facility, and was lulled into a false sense of security and "robbed of the opportunity to take security measures into his own hands."

▮ As the court explained in *Delgado, supra*, 36 Cal.4th at page 249: "Our cases establish that a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result."

---

[7] Ericson's reliance on *Barber v. Chang* (2007) 151 Cal.App.4th 1456 [60 Cal.Rptr.3d 760], is misplaced. In that case, a tenant sued the owner of a small apartment complex after another tenant (Daniel) shot him. The landlord had received prior written notice that Daniel had brandished a shotgun at another tenant and a visitor in an angry and threatening manner. (*Id.* at pp. 1459–1460, 1466.) The court concluded "that a tenant who brandishes a gun while uttering threats . . . poses a foreseeable risk of harm to others," and consequently the defendant failed to meet his initial burden of showing he owed no duty, based on lack of notice, to take at least minimally burdensome measures to reduce the risk of harm. (*Id.* at p. 1467.) Here, FedEx's motion for summary judgment focused on the alleged lack of any duty to provide security guards, and in opposition to the motion Mark argued FedEx had a duty to provide minimally burdensome security measures. In its reply, FedEx addressed that issue. In contrast to *Barber v. Chang*, FedEx adduced evidence in support of its motion for summary judgment that showed it was entitled to judgment as a matter of law, as there was a lack of foreseeability under any test, and thus shifted the burden to Mark to raise a triable issue of fact.

*Delgado, supra*, 36 Cal.4th at page 249, footnote 28, cited *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], in which the court rejected the argument a highway patrolman's aid of an injured or stranded motorist created a special relationship giving rise to a duty to secure information or preserve evidence for civil litigation between the motorist and third parties. (*Id.* at p. 21.) The court discussed the "good Samaritan" rule, and explained that although generally no special relationship existed between the California Highway Patrol and the motoring public and stranded motorists, "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization." (*Id.* at p. 24.) "The breach of duty may be an affirmative act which places the person in peril or increases the risk of harm as in *McCorkle* v. *Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], where an officer investigating an accident directed the plaintiff to follow him into the middle of the intersection where the plaintiff was hit by another car. The negligence may also constitute an omission or failure to act, as in *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508], where a deputy sheriff promised to warn a decedent if a prisoner, who had made threats on her life, was released." (*Id.* at p. 24.)

Ericson does not explain how FedEx's security measures increased the risk of harm to Mark, other than through his justifiable reliance on them. Ericson claims Mark "reasonably relied on the fact that FedEx was enforcing its own safety protocols and procedures to control unauthorized persons from entering the terminal parking lot, and to otherwise monitor closely the activities of those personnel authorized to enter that lot." Ericson also asserts Mark relied "on the fact that FedEx rigorously required all personnel at the terminal to sign-in [*sic*] and sign-out [*sic*] upon entering and leaving the terminal." He cites a document entitled "FedEx Post Orders," which provides certain protocols, including that "[a]ll persons entering and leaving FedEx property must be cleared through the security checkpoint," and visitors will be asked for a photo identification before entering the facility. The security guard on duty was required, for instance, to use visitor log sheets. These protocols are unhelpful, however, because there is no evidence they were not followed.

At his deposition, Mark testified he had observed cameras "[o]n the corners of the building, upper part of the roof," but he had never asked anyone or been told by anyone why the cameras were there. He also agreed he had no idea what the cameras were looking at. He also testified that he initially believed there was a closed-circuit television system within the terminal, but "then I was told there wasn't," and "[o]ne of the workers there [said] . . . I've been in every room in this building and there's no security system in this building." Mark elaborated as follows: "We were inside the building waiting

for our trailers to get loaded and we were talking about, you know, the security cameras, and Cory [a FedEx Ground employee] came by . . . and he goes, 'I've been in every room of this building and there is no security camera system in this building.' "

■ Mark's declaration stated he believed the cameras "were provided for the security of the property and people, including myself, at the terminal." The declaration does not create a triable issue of fact as to Mark's reliance on the cameras, however, because the court may disregard a declaration prepared in opposition to a summary judgment motion that conflicts with the declarant's deposition testimony. (*Jacobs v. Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1270 [42 Cal.Rptr.2d 906].) Mark's deposition testimony belies the justifiable reliance claim.

Moreover, there was no triable issue of fact as to Mark's reasonable reliance on the presence of a security guard at the east entrance to the FedEx facility. There was no evidence a security guard at the east entrance to the facility could deter or discourage a crime committed at night at the canyon edge of the property by transients gaining access to the parking lot through the canyon. The area of Mark's parking space was dimly lit. Further, the declaration of his security consultant stated the distance between the parking space and the guardhouse was approximately 444 feet, and the view between the two was obstructed by parked trailers. According to the expert, the security guard could not see or monitor any activity in the area of Mark's parking space from the guardhouse. Although FedEx's written protocols called for "[p]erimeter patrols . . . once every hour when two security officers are present for duty and other times as the traffic volume at the gate permits," there is no evidence Mark was aware of that procedure. Mark's declaration merely stated he was "aware that a security guard was regularly present on the [Federal] Express side of the . . . facility," and that "cameras were mounted on the exterior of the building."

We conclude the negligent undertaking doctrine is inapplicable. The trial court, however, did make an error in its ruling, which states: "The evidence shows that defendants hired a security guard to oversee egress and ingress to the FedEx eastern portion of the lot. Further, the inoperable surveillance cameras were affixed to the eastern exterior side of the premises. There is no evidence that either the guard or the cameras would have monitored the *western* portion of the lot occupied by FedEx Ground." (Italics added.) FedEx Ground operated out of the western portion of the parking lot, but Mark's designated parking space was on the northeast corner of the lot. Despite any confusion of the court as to the facts, its ruling was proper on other grounds.

## DISPOSITION

The judgment is affirmed. FedEx is entitled to costs on appeal.

Haller, J., and McIntyre, J., concurred.