Filed 3/18/14  Follett v. Mulberry Mobilehome Park Assocs. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANTHONY FOLLETT et al., | B244102 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. PC051053) |
| v. | |
| MULBERRY MOBILEHOME PARK ASSOCIATES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randy Rhodes, Judge.  Affirmed.

Schimmel & Parks, Alan I. Schimmel, Michael W. Parks and Stacey R. Cutting for Plaintiffs and Appellants.

Early, Maslach & O'Shea, Ronald R. Heard; Law Office of Priscilla Slocum and Priscilla Slocum for Defendants and Respondents.

_____

Plaintiffs and appellants Anthony and Marcela Follett[1] appeal from a summary judgment in favor of defendants and respondents Mulberry Mobilehome Park Associates, MZL Properties, Inc., David Weiswasser, and Weiswasser D&M Trust in this action arising out of criminal acts by third parties that targeted the Folletts' property. The Folletts contend: 1) defendants had a duty to take reasonable measures to secure the premises against foreseeable criminal acts by third parties, and the arson that destroyed the Folletts' mobilehome was foreseeable, based on an ongoing pattern of criminal activity; 2) their nuisance cause of action is separate and distinct from their negligence cause of action; 3) triable issues of fact exist as to whether defendants breached the lease agreement by failing to enforce rules of conduct against the Folletts' neighbors; and 4) the trial court erred by excluding the declaration of the Folletts' property management expert. We find the act of arson was not foreseeable, the nuisance cause of action is resolved by the negligence determination because it is based on the same facts and duty to act, and there was no breach of the lease agreement. The expert declaration would not change these conclusions had it been admitted. Therefore, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### Events at the Mobilehome Park

In August 1994, the Folletts leased a space for their mobilehome from Mulberry. The lease required the park management to provide and maintain the common facilities of the park in good working condition, including streets, unrestricted parking areas, and other facilities. The lease stated that any violation of the park's rules and regulations would be deemed a public nuisance. The lease also stated that Mulberry was entitled to

---

[1] When parties or witnesses share the same last name, we will refer to them individually by their first names.

2

any legal remedy for a breach of the lease or the rules, including restraining the tenant from continuing to breach the rules.

The park's rules and regulations contain several provisions governing conduct. Section 11, subdivision (a), states:  "Actions by any person, which may be construed by management to be dangerous or create a health and safety problem or disturb others, are not permitted.  This includes, but is not limited to, any unusual, disturbing or excessive noise, intoxication, quarreling, threatening, fighting, immoral or illegal conduct, profanity, or rude, boisterous, objectionable or abusive language or conduct."

Section 11, subdivision (c), provides:  "Homeowners and guests must be quiet and orderly and shall not do anything which might be cause for complaint.  Homeowners must acquaint all guests and occupants of the mobilehome with the Park's Rules and Regulations."

Section 11, subdivision (e), states in pertinent part:  "Homeowners and their guests shall not encroach or trespass upon any other Homeowner's homesite or upon any area which is not open for general use by Homeowners and their guests."

Section 11, subdivision (h), provides:  "The violation by Homeowner of any law, regulation or ordinance of the city, county, state or Federal government will not be tolerated.  No acts or demeanor on the part of Homeowner, which would place the Owner in violation of any law, regulation or ordinance shall be permitted."

The Folletts and their children lived in the mobilehome.  The Folletts also rented an RV storage area directly behind their mobilehome site.  In 2000, the Weiswasser D&M Trust purchased the park.  David Weiswasser is the trustee of the trust.  The trust engaged the services of property management company MZL for daily operations.  Iren Panici has been MZL's onsite property manager since MZL took over management of the property in 2000.

In 2003, when a resident was involved in an altercation that involved a knife and a shotgun, MZL sent a warning letter to the resident that aggression would not be tolerated. In 2004, MZL requested the mayor's assistance to improve the response time of law

3

enforcement to the park. Between 2004 and 2006, MZL sent two letters to residents warning them to control the disruptive behavior of a child or grandchild.

In November 2008, a rainstorm knocked a branch from a tree in the Folletts' yard onto a motorcycle belonging to his neighbor Chirawat Chotikasupasanee. Chirawat's wife Sue Chotikasupasanee pounded on the Follett's door and showed them the tree branch. The Folletts took a picture. Although the tree belonged to the park, Sue threatened to take legal action against the Folletts. However, the tree branch did not cause any damage to the motorcycle.

In December 2008, while the Folletts' truck was parked in their driveway, the tailgate and driver's door of the Folletts' truck was scratched with a sharp object down to the primer paint. The Folletts did not report this vandalism.

That same month, a heavy steel shovel was stolen from the Folletts front porch, and shortly after, a hand truck they used to roll trash cans to the curb was stolen. Anthony reported the thefts to Panici. Panici told him to keep items locked up and not leave anything out, which Anthony did not believe he should have to do.

The Folletts attended a regular meeting every Friday night. Their babysitter would arrive shortly before 8:00 p.m., and the Folletts would go out from 8:00 p.m. to approximately 10:30 p.m. One Friday in March 2009, Anthony came home from the meeting and found an unwrapped, unused condom on his back porch. He thought it was a prank of some kind and did not report it to Mulberry.

Another Friday in March, the Folletts came home from the meeting and found graffiti spray painted near the back door of the mobilehome. An unwrapped, unused condom was on the back porch, along with an empty beer bottle in a brown paper bag. The garden hose had been cut, the water turned on, and water was shooting out over the side of the home. The children and the babysitter inside the home had not heard anything. The Folletts called the Los Angeles County Sheriff's Department. A deputy came to the house and advised the Folletts to install a motion sensor light, which they immediately did. They also reported the vandalism to Panici.

The following Friday, Marcela chose to stay home. Two minutes after Anthony backed the truck out and drove away, the motion sensor light turned on. Marcela looked out the back window and saw Sue trying to open the shed on the Folletts' property. Marcela opened the door and asked what she was doing. Sue ran to the end of the driveway. She returned and tried to talk to Marcela, but Marcela threatened to call the police. Marcela called Anthony, who came home. They called the Sheriff's Department. Deputies came to their home, then visited Sue. They returned and told the Folletts that they could not arrest Sue for trespassing, because Sue said she was returning mail of the Folletts that had been delivered to her home. The deputies gave the mail to the Folletts and advised them to install security cameras, which they did. Anthony decided not to make a citizen's arrest. He hoped the discussion with the police would be enough to change Sue's behavior. The Folletts told Panici about the incident and wanted her to write a letter to the Chotikasupasanees, but Panici said there was nothing she could do.

However, Panici spoke to Sue about the incident. Panici did not find Sue's story believable, because the Follett's mailbox in their front yard was open and unlocked. There was no need for Sue to be in the back by their shed. She admonished Sue to respect her neighbor's property and reminded her of the rules and regulations. The cameras that the Folletts installed were obvious, and there were no further incidents on Friday nights after the cameras were installed.

In May 2009, the Folletts found approximately 90 square feet of their lawn was discolored and dying. A substance coated their children's swing set and toys in the yard. A gap in the fence to the Chotikasupasanees' yard was centered on the portion of lawn that died. The Folletts believe the substance was sprayed through the fence to their yard. They told Panici about it, but she said there was nothing that she could do. She suggested that the Folletts build a higher fence, which they did.

In August 2009, Anthony saw Sue throw cat feces into the street in front of the Folletts' home. He was disgusted, because the neighborhood kids play there. Anthony swept the mess into a dust pan and went to Sue's window. He said, "Please don't dump these in my yard anymore." He made sure that she saw him dumping the cat feces in her

yard. Chirawat came out of the home and threw the cat feces back into the street. Anthony asked why he did not throw it in the trash. Chirawat refused. Anthony explained that the kids play in the street, but Chirawat did not care. Anthony got a push broom and swept a pile. Chirawat tried to confront him, but Anthony refused to be provoked. When Chirawat asked what Anthony was going to do with the cat feces, Anthony replied that it depended on him. Chirawat came running off his front porch, kicked the broom, and broke it in half, started swinging his fists at Anthony and scattered the pile. Anthony defended himself by fending off blows. Chirawat called the sheriff's department and claimed Anthony had injured him by kicking him in the groin. Chirawat made a citizen's arrest of Anthony and the deputies took him to the substation. The deputies were very apologetic, booked him, and released him. The Folletts told Panici about the incident with the cat feces. She agreed that it was disgusting and bad behavior but said there was nothing she could do about it.

A few days later, deputies served Anthony with a temporary restraining order. That day, a bushy tree in the Folletts' yard showed discoloration and damage similar to the incident with the lawn. The restraining order was not made permanent.

The Folletts keep a boat with a cover on it in the RV storage space behind their home. A new neighbor heard a tearing noise and saw a woman by the boat. He called out to ask what she was doing and she ran. The neighbor told Anthony about the incident. He described the woman that he saw and the Folletts believed it was Sue. They found the boat cover had been cut. The Folletts did not discuss the incident with police, and they do not remember discussing it with the park management.

In October 2010, Anthony saw a red car parked against the boat and an unknown man sleeping in the car. Anthony woke him up and told him that he needed to move. He called the assistant manager to report the man. The man spoke to him with attitude. A few days later, Marcela noticed a man in the RV storage space. Anthony heard her speaking to him and saw the same man who had been sleeping in his car. He complained to Panici about the unknown man lurking behind the home.

6

One night, tires were slashed on vehicles in the park, although none of the Folletts' tires were cut. The Folletts left town to spend Thanksgiving with family in Nevada. On November 26, 2010, the tires of several cars on the Folletts' street were slashed, but none of the Folletts' tires.

On November 27, 2010, while the Folletts were out of town, a fire destroyed their mobilehome. Los Angeles County Sheriff's Department Sergeant Wendy Zolkowski, who works in the arson explosives detail, concluded that the fire started at 2:00 a.m. and was purposely set to burn the Folletts' property. Charcoal lighter fluid had been spread in more than one location inside the mobilehome, which was the cause of the fire. The identity of the arsonist is not known.

**Legal Proceedings**

On June 28, 2011, the Folletts filed a complaint against Mulberry and MZL for negligence, breach of the lease agreement, breach of the implied warranty of habitability, nuisance, and intentional infliction of emotional distress. The Folletts alleged that they made numerous complaints about the safety of the mobilehome park between November 2008 and November 2010, which Mulberry promised and failed to cure. The complaints included the theft of tools, the condoms on the Folletts' porch, vandalism, trespass by neighbors, and the unknown man sleeping in the Folletts' parking space. The arson that destroyed the Folletts' mobilehome in November 2010 resulted from defendants' failure to keep the premises in a reasonably safe condition as required by the lease and the rules and regulations.

Panici repeatedly told the Folletts that there was nothing she could do to help them. The Folletts suggested hiring a security patrol or installing a gate, but Panici claimed defendants had denied the requests. The failures to inspect, maintain, and keep the mobilehome park in a reasonably safe and habitable condition contributed to the cause of the fire. Defendants were aware of serious threats to the health and safety of the

7

Folletts and other residents, including dangerous and threatening acts. The Folletts were forced to vacate, incurred expenses, and suffered emotional distress.

Weiswasser and the trust were substituted as Doe defendants. The defendants filed a motion for summary judgment on May 18, 2012, on the grounds that they had no duty to protect the Folletts from unforeseeable criminal conduct by third parties and there was no causative link between the alleged acts and the Folletts' injuries.

Defendants submitted evidence of the undisputed facts set forth above. In a declaration, MZL's president stated MZL's policy regarding tenant complaints. When a manager has personal knowledge of a violation of the park rules or receives a complaint from a tenant based on personal knowledge, the manager speaks with the offending tenant. If the tenant is noncompliant, a warning letter is issued. The manager is not to become involved in tenant disputes but should suggest the tenant call the police. Since MZL assumed management of the park in 2000, there have been complaints of minor vandalism to several home sites and common areas, as well as property thefts, but there has never been a report of any fire to any structure or any acts which caused any structural damage to the homes or sites. In Panici's deposition testimony, she noted that a subsequent fire at the mobilehome park that same year killed the occupant of the home. Panici does not know how the second fire started.

The Folletts opposed the motion on the ground that the numerous prior criminal acts were sufficiently similar to arson to make arson foreseeable and warrant imposition of a duty. In addition, there were triable issues of material fact as to whether defendants had breached the implied covenant of quiet enjoyment by failing to investigate or resolve the acts of vandalism and theft, or to take action against the Chotikasupasanee, resulting in the Folletts' losses. In addition, defendants' failure to take action permitted a nuisance.

The Folletts submitted additional portions of Panici's deposition. She stated that she does not have any system for recording verbal complaints and most complaints are never reduced to writing. She does not know if the Folletts reported any complaints to the park's assistant manager. There is no policy for investigating complaints about

8

tenants, including a tenant trespassing on a neighbor's property. They do not keep track of incidents like vandalism or theft where they advise tenants to contact the police. When they have a problem with a tenant violating the rules and regulations, they send a warning letter. The most recent letter was sent in 2006. Tenants have suggested that the park install gates or hire security, but MZL has never considered these measures or consulted with a security firm. A security service would cost between 18 and 25 dollars per hour.

The Folletts also submitted the declaration of residential property management expert Michael Chulak. He declared the following was unreasonable: 1) not providing the property manager with training on landlord-tenant law and relationships; 2) not having written policies for tenant conflicts, vandalism, loitering and other issues; 3) not having written policies to enforce compliance with the rules and regulations; 4) not reducing verbal reports to writing; and 5) not promptly investigating tenant complaints of destructive and unlawful behavior.

Chulak declared that property managers are obligated to make reasonable investigations into reports of theft, vandalism, trespass, and other criminal activity. Based on the size of the mobilehome park and the frequency of the criminal activity directed at the Folletts, Panici should have investigated the source of the activity and contacted law enforcement for guidance as to the repeated vandalism and trespass suffered by the Folletts.

Mulberry is expected to maintain the premises pursuant to its contractual obligations and in a safe manner where residents are free from repeated acts of criminal conduct. In Chulak's opinion, MZL recklessly disregarded the Folletts' safety by failing to document, investigate, or take remedial measures as to their complaints of crimes against them. MZL did not follow basic standard of care and did not adequately maintain the safety of the park with respect to documentation, investigation, and resolution of complaints about the Chotikasupasanees and criminal activity directed at the Folletts. MZL did not adequately maintain and manage the security of the park, as shown by the failure to contact law enforcement for guidance and to request nightly patrols, and failing to consult professional security firms. MZL did not follow basic standards of care of a

9

property management company when provided notice that a resident is subject to a concerted criminal effort. MZL and Weiswasser did not manage the park within the standard of care for property managers owed to tenants and did not manage the safety and security of the tenants within the custom and practice for property managers.

Defendants filed a reply on the grounds that the arson was unforeseeable and the suggestion that security measures would have prevented the crime was pure speculation. Both parties filed objections to evidence submitted with the pleadings. The trial court sustained defendants' objection to Chulak's entire declaration.

A hearing was held on August 1, 2012. The trial court concluded the arson was not foreseeable as a matter of law from the types of criminal acts that the park was aware had occurred. On September 11, 2012, the trial court entered an order granting summary judgment and a judgment in favor of Mulberry, MZL, Weiswasser, and the trust. The Folletts filed a timely notice of appeal.

## DISCUSSION

**Standard of Review**

"We review the grant of summary judgment de novo. [Citation.] We make 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. [Citation.] Once the defendant has made such a showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action. [Citation.]" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1216–1217.)

10

"In performing our de novo review, we view the evidence in the light most favorable to plaintiffs as the losing parties. [Citation.] In this case, we liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

In *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, the Supreme Court declined to address whether the trial court's evidentiary rulings in connection with a summary judgment motion are reviewed de novo or for an abuse of discretion (*id.* at p. 535). We do not consider the proper standard of review, because under either standard, there is no error.


## Negligence


The Folletts contend defendants were required to take certain steps to ensure the premises were secure against foreseeable criminal acts. They further contend that arson was foreseeable from the ongoing pattern of criminal activity against the Folletts' property. We disagree.

To establish negligence, the plaintiffs must show that the defendants owed them a duty, breached the duty, and the breach was a proximate or legal cause of the plaintiffs' injuries. (*Ericson v. Federal Express Corp.* (2008) 162 Cal.App.4th 1291, 1299-1300 (*Ericson*).) Although there is generally no duty to protect others from criminal acts by third parties, one exception is the "special relationship doctrine." (*Ibid.*)

"A landlord generally owes a tenant the duty, arising out of their special relationship, to take reasonable measures to secure areas under the landlord's control against foreseeable criminal acts of third parties. [Citations.] In each case, however, the existence and scope of a property owner's duty to protect against third party crime is a question of law for the court to resolve. [Citations.]" (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*).)

11

We consider several factors to determine the existence and scope of the landlord's duty: "'[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 675, fn. 5 (*Ann M.*), quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*).)

"[F]oreseeability is a critical factor in the analysis. When foreseeability is analyzed to determine the existence or scope of a duty, foreseeability is also a question of law. [Citation.]" (*Ericson*, *supra*, 162 Cal.App.4th at p. 1300, fn. omitted.)

In *Ann M.*, the Supreme Court explained that "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] '"[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation]' [Citation.] Or, . . . duty in such circumstances is determined by a balancing of 'foreseeability' of the criminal acts against the 'burdensomeness, vagueness, and efficacy' of the proposed security measures." (*Ann M., supra,* 6 Cal.4th at pp. 678-679.)

"The plaintiff in *Ann M.* was raped at her place of employment, a business located in a secluded area of the defendant's strip mall. (*Ann M., supra,* 6 Cal.4th at p. 670.) The court held violent criminal assaults were not sufficiently foreseeable to impose a duty on the defendant to provide security guards in the mall's common areas, as the defendant had no notice of prior similar incidents on the premises. (*Ann M., supra,* 6 Cal.4th at p. 679.) The court concluded that '[n]either the evidence regarding the presence of transients nor the evidence of the statistical crime rate of the surrounding area is of a type

12

sufficient to satisfy this burden.' (*Id.* at p. 680.)" (*Ericson*, *supra*, 162 Cal.App.4th at pp. 1300-1301.)

"The *Ann M.* court concluded that while certain circumstances may require an owner to hire security guards to satisfy the duty of care, that measure will almost always be considered a significant burden, given the financial and social costs, and the uncertainty that patrols will deter crime. The court explained, '[u]nfortunately, random, violent crime is endemic in today's society,' and '"[n]o one really knows why people commit crime, hence no one really knows what is 'adequate' deterrence in any given situation."' (*Ann M., supra,* 6 Cal.4th at pp. 678-679.) Accordingly, when the measure at issue is the hiring of security guards, evidence of prior similar incidents of crime on the owner's premises is ordinarily required to prove the requisite degree of foreseeability, although criminal incidents at a nearby similar business may help establish foreseeability. (*Id.* at p. 679 & fn. 7.)" (*Ericson*, *supra*, 162 Cal.App.4th at p. 1301.)

If the burden of preventing harm from third party criminal conduct is high, the law requires "'heightened foreseeability[,] shown by prior similar criminal incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location . . . .' [Citation.]" (*Ericson*, *supra*, 162 Cal.App.4th at p. 1302.) "'By contrast, in cases in which harm can be prevented by simple means or by imposing merely minimal burdens, only "regular" reasonable foreseeability as opposed to heightened foreseeability is required.' [Citation.]" (*Ibid.*)

The *Castaneda* court explained the steps required in the duty analysis: "'First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility

13

to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on the landlord.' [Citation.]" (*Castaneda, supra*, 41 Cal.4th at p. 1214, citing *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 285.)

"When a '"regular" reasonable foreseeability' [citation] test is applicable, the court must determine whether '"the degree of foreseeability is high enough to charge the defendant with the duty to act on it. If injury to another '"is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct"' [citations], we must label the injury 'reasonably foreseeable' and go on to balance the other *Rowland*[, *supra*, 69 Cal.2d 108] considerations." [Citation.]' [Citation.]" (*Ericson, supra*, 162 Cal.App.4th at p. 1303, fn. omitted.)

"To establish the heightened foreseeability necessary to impose a heavily burdensome duty such as hiring security guards, we have explained, the plaintiff must show the existence of prior similar incidents on the premises or other sufficiently serious 'indications of a reasonably foreseeable risk of violent criminal assaults.' [Citation.] Criminal incidents at an 'immediate[ly] proximat[e] . . . substantially similar business establishment' can help to show the requisite foreseeability. [Citations.]" (*Castaneda, supra*, 41 Cal.4th at p. 1222.)

"'A landlord is not obliged to institute eviction proceedings whenever a tenant accuses another tenant of harassment.' [Citation.]" (*Castaneda, supra*, 41 Cal.4th at p. 1222.) "[U]ndertaking eviction of a tenant cannot be considered a minimal burden. The expense of evicting a tenant is not necessarily trivial, and eviction typically results in the unit sitting vacant for some period." (*Id.* at p. 1219.)

"[T]he Mobilehome Residency Law permits termination of a tenancy for conduct that constitutes a 'substantial annoyance' to other residents (Civ. Code, § 798.56, subd. (b)), conviction of specified offenses occurring in the mobilehome park (*id.,* subd.

14

(c)), and failure to comply with a reasonable rule included in the rental agreement (*id.,* subd. (d)). The park management must include in the notice of termination a statement of the reasons 'with specific facts to permit determination of the date, place, witnesses, and circumstances' supporting the termination. (Civ. Code, § 798.57.) Under section 798.56, subdivision (d), moreover, the management must give the tenant notice and seven days to cure a rule violation or must have cited the tenant for the same violation three or more times in a 12-month period." (*Castaneda*, *supra*, 41 Cal.4th at p. 1219, fn. 4.)

"Not surprisingly in light of the burden involved, courts in this and other states have recognized a tort duty to evict a vicious or dangerous tenant only in cases where the tenant's behavior made violence toward neighbors or others on the premises highly foreseeable." (*Castaneda*, *supra*, 41 Cal.4th at pp. 1219-1220.) "In *Madhani v. Cooper* (2003) 106 Cal.App.4th 412 [(*Madhani*)], the court held the defendant landlords owed a duty of care to protect the plaintiff/tenant from foreseeable future assaults by Moore, a fellow tenant and neighbor. (*Id.* at p. 415.)" (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 595 (*Andrews*).) "[Moore] shoved, bumped and physically blocked the plaintiff and her mother on several occasions, as well as berating them. Despite the plaintiff's frequent complaints to the defendant's property manager, no action was taken against the assailant, who ultimately pushed the plaintiff down the building's stairs, injuring her. ([*Madhani, supra,*] at pp. 413-415.) The Court of Appeal held the landlord had had a duty to evict the assaultive tenant if necessary, observing that '[i]t is difficult to imagine a case in which the foreseeability of harm could be more clear.' (*Id.* at p. 415.)" (*Castaneda*, *supra*, 41 Cal.4th at pp. 1219-1220, fn. omitted.) "There, the evidence showed 'the landlords knew or should have known Moore had engaged in *repeated acts of assault and battery* against Madhani as well as her mother.' ([*Madhani, supra*, at p. 415].) Therefore, 'it was foreseeable Moore's violent outbursts and physical assaults would eventually result in serious injury to Madhani.' (*Id.* at p. 416.)" (*Andrews, supra,* at p. 595.)

In the instant case, none of the incidents prior to November 27, 2010, involved arson. The Folletts complained of isolated incidents of petty theft, vandalism,

harassment, and annoyances. The acts took place outside their home several months apart. In response to each of the Folletts' complaints, defendants or law enforcement recommended a security measure that was completely effective in preventing similar harassment or criminal activity. None of the activities the Folletts complained of to defendants were inherently dangerous felonies like arson and there were no prior incidents of arson. As a matter of law, it was not foreseeable from the minor grievances and confrontations that an intruder would break into the Folletts' mobilehome and commit arson. There was an insufficient showing to put defendants on notice of the risk of arson.

## Nuisance

The Folletts contend their cause of action for nuisance is distinct from their cause of action for negligence. We disagree.

"In California, it is settled that where negligent conduct, i.e., conduct that violates a duty of care toward another, also interferes with another's free use and enjoyment of his property, nuisance liability arises. [Citations.]" (*Lussier v. San Lorenzo Valley Water Dist.* (1998) 206 Cal.App.3d 92, 101 (*Lussier*).) "Given 'the broad definition of nuisance,' the independent viability of a nuisance cause of action 'depends on the facts of each case.' [Citation.] 'Where negligence and nuisance causes of action rely on the same facts about lack of due care, the nuisance claim is a negligence claim.' [Citation.] The nuisance claim 'stands or falls with the determination of the negligence cause of action' in such cases. [Citation.]" (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542 (*Melton*).)

Since defendants in this case did not commit the criminal acts that caused the Folletts harm, liability is based on failing to prevent the acts and thereby prevent the harm it caused. "In general, however, the failure to protect another person is not tortious unless this failure violated a preexisting duty of care. [Citations.]" (*Luisser*, *supra*, 206 Cal.App.3d at p. 103.) "[U]nder certain circumstances, the worlds of nuisance and

16

negligence overlap and the two become merely alternative legal theories for redressing what is really the invasion of a single primary right: the right to the undisturbed enjoyment of one's property and land. [Citation.]" (*Id.* at p. 104.)

"Thus, in *Calder v. City etc. of San Francisco* (1942) 50 Cal.App.2d 837, 839, the court observed, 'While it is true that "a nuisance and liability for injuries occasioned thereby may exist without negligence" [citation], it is likewise true that "The torts of negligence and nuisance may be, and frequently are, coexisting and practically inseparable. . . . A nuisance in many, if not in most, instances, especially with respect to buildings or premises, presupposes negligence." [Citations.]' [Citation.]" (*Luisser*, *supra*, 206 Cal.App.3d at p. 104.)

"This view -- that proof of negligence may be essential to a claim of nuisance where the alleged nuisance involves a failure to act -- is not unique. Elsewhere it has been noted that '[t]he duty of defendant with respect to a dangerous condition which he did not intentionally originate is not absolute, but only to exercise such a degree of care and diligence as the danger demands[]' and that 'where liability for the nuisance is predicated on the omission of the owner of the premises to abate it, rather than on his having created it, then negligence is said to be involved.[]' [Citations.]" (*Luisser*, *supra*, 206 Cal.App.3d at pp. 104-105, fn. omitted.)

In this case, the Folletts claim defendants' failure to take certain actions created a nuisance. Unless defendants had a duty to take the actions, they have not committed any act to support the nuisance claim. The nuisance claim relies on the same facts as the negligence claim and there are no additional facts to support it. Since the criminal acts which caused the Folletts' harm are not attributed to defendants, the basis for nuisance liability has to be the negligent failure to take preventative measures. The Folletts' cause of action for nuisance has no independent viability, "because it merely restates their negligence claims 'using a different label.' [Citation.]" (*Melton*, *supra*, 183 Cal.App.4th at p. 543.)

17

**Breach of the Lease Agreement**

The Folletts contend defendants breached the lease agreement, including the implied covenant of quiet enjoyment, by failing to enforce park rules regulating the conduct of residents. The actions that the Folletts contend violated park rules were: the theft of tools, the vandalism to the Folletts' truck, the vandalism of their house, Sue's trespass near their tool shed, the destruction of lawn, the destruction of trees, the throwing of cat feces, the physical attack by Chirawat, and the vandalism of their boat cover. The Folletts contend defendants should have enforced the park rules by investigating their complaints about Sue, deterring her conduct through cease and desist letters threatening legal action, enjoining her conduct, instituting eviction proceedings against the Chotikasupasanees, and calling on law enforcement for advice and cooperation with respect to the Chotikasupasanees' conduct. We disagree with the Folletts' analysis.

"A mobile home park owner cannot disregard conduct by a tenant upon the park premises that constitutes a substantial annoyance to other homeowners or residents. (Civ. Code, § 798.56, subd. (b).) Faced with such a situation, the covenant of quiet enjoyment requires a reasonable response by the landlord, which may include conducting an investigation and thereafter, taking appropriate action, which may include, inter alia, the issuance of a warning to the offending party, the pursuit of injunctive relief against the tenant to enjoin the violation (*id.,* § 798.88), or, if necessary, the commencement of eviction proceedings (*id.,* § 798.56)." (*Andrews*, *supra*, 125 Cal.App.4th at p. 597.)

"Minor inconveniences and annoyances are not actionable breaches of the implied covenant of quiet enjoyment. To be actionable, the landlord's act or omission must substantially interfere with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. (*Petroleum Collections Inc. v. Swords* [(1975)] 48 Cal.App.3d [841,] 846; see, e.g., *Pierce v. Nash* (1954) 126 Cal.App.2d 606, 614, [landlord breached tenant's right to quiet enjoyment by installing interior building supports which unnecessarily interfered with tenants billiards business]; *Sierad v. Lilly*

(1962) 204 Cal.App.2d 770, 775 [landlord breached covenant of quiet enjoyment by denying retail tenant use of adjoining parking spaces which were essential to tenant's use and enjoyment of the property]; Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2003) § 4:8, pp. 4-5.)" (*Andrews*, *supra*, 125 Cal.App.4th at pp. 589-590.)

In this case, defendants' response to each of the Folletts' complaints was reasonable as a matter of law under the facts. When the Folletts' tools were stolen in December 2008, they had no idea who took them. The park management recommended the Folletts keep items locked up. This is an objectively reasonable recommendation and was sufficient to prevent any further thefts. The security measures that the Folletts contend should have been taken were not required in response to the complaint of missing tools. There is no evidence the Folletts reported the vandalism to their truck that occurred around the same time.

When the Folletts reported the increasingly destructive vandalism of their home in March 2009, they had no idea who the perpetrator was. Law enforcement recommended the installation of motion sensor lighting. The following week, the motion sensor lighting caught Sue trespassing in the back yard. The Folletts complained about Sue's trespass to park management and installed cameras. Panici investigated the incident by speaking with Sue and admonished her about the park rules. There were no further incidents of nighttime vandalism of the Folletts' home. The measures recommended and undertaken were entirely effective. None of the measures the Folletts contend should have been taken would have been appropriate based on one incident of trespass. Sue had the excuse that she was returning misdelivered mail, and she would have had seven days to cure a rule violation, which she clearly would have done.

Two months later, the Folletts complained that a portion of their lawn had died and accused the Chotikasupasanees of spraying a poisonous substance into their yard. Defendants' suggestion to build a higher fence was reasonable and solved the problem better than a security patrol, a gated entry, or the Folletts' other suggested measures. If the park management had investigated the Folletts' complaint and sent a cease and desist

19

letter, the outcome would have been no different, because there were no further incidents of damage to the back yard. Three months later, the Folletts found a tree in their front yard was damaged and had similar suspicions about their neighbors' conduct. However, there is no evidence they reported the later damage to park management for additional investigation and enforcement of the park rules.

In August 2009, Anthony was disturbed by the fact that Sue threw cat feces into the street. He chose to handle it by trespassing on the Chotikasupasanees' property, confronting Sue and throwing the feces on their property. There is no evidence that Sue intended to annoy the Folletts when she tossed her refuse in the street, and she was not involved in the incident otherwise. The confrontation escalated to a physical attack by Chirawat. The Folletts have not explained how a security gate, patrol, or an investigation by park management were required with respect to the circumstances of this incident. If a cease and desist letter had been sent to the Chotikasupasanees, the outcome would have been no different than it was. This is the sole incident between Anthony and Chirawat and the Folletts had no further complaints about Chirawat's conduct. Apparently, Sue disposed of cat feces appropriately following the incident, because Anthony did not complain again to park management about cat feces in the street.

For more than a year after this confrontation, the Folletts did not report any acts of harassment, vandalism, or criminal activity. They experienced one incident of vandalism to their boat cover in the spring of 2010, which they believe Sue committed, but they do not remember reporting it to the park management. Therefore, the Folletts did not report having any incidents with either of the Chotikasupasanees for the 15 months before their home was destroyed by arson in November 2010. Based on these facts, as a matter of law, defendants did not breach express or implied covenants of the lease agreement by failing to take the actions suggested by the Folletts.

If the trial court had overruled the objection to Chulak's declaration, our conclusion would not be different. The expert declaration does not change any of the facts of this case from which our conclusions are derived. The Folletts have not raised

20

any issues on appeal with respect to any other causes of action alleged in the complaint. Therefore, the judgment must be affirmed.

## DISPOSITION

The judgment is affirmed. Respondents Mulberry Mobilehome Park Associates, MZL Properties, Inc., David Weiswasser, and Weiswasser D&M Trust are awarded their costs on appeal.


KRIEGLER, J.


We concur:


TURNER, P. J.


MINK, J.*

---

* Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.